T.C. Memo. 2016-226

UNITED STATES TAX COURT

AD INVESTMENT 2000 FUND LLC, COMMUNITY MEDIA, INC., A
PARTNER OTHER THAN THE TAX MATTERS PARTNER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent[*]

AD GLOBAL 2000 FUND LLC, WARSAW TELEVISION CABLE CORP., A
PARTNER OTHER THAN THE TAX MATTERS PARTNER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 9177-08, 9178-08.                    Filed December 14, 2016.


        On account of Ps' postdecision challenges to one of R's expert
witnesses, we will vacate our decisions, which were substantially for
R, in order to reconsider our findings of fact and opinion.  Upon
reconsideration, disregarding the challenged expert's testimony, we
reach the same conclusions and will reenter our decisions for R.

_____

        [*]This opinion supplements our previously filed Memorandum Opinion, <u>AD</u>
<u>Inv. 2000 Fund LLC</u>, T.C. Memo. 2015-223.

**[*2]**   Elliot Silverman and Orrin Tilevitz, for petitioners.

Veronica L. Richards and Daniel L. Timmons, for respondent.


SUPPLEMENTAL MEMORANDUM OPINION


HALPERN, Judge:  Petitioners brought these cases for us to review two notices of final partnership administrative adjustment (FPAAs).  We did so and reported the results of our review in our Memorandum Findings of Fact and Opinion (Memorandum Opinion) AD Inv. 2000 Fund LLC, T.C. Memo. 2015-223, filed November 19, 2015.  We entered decisions (substantially in respondent's favor) on February 8, 2016.  With our permission (because otherwise such motions would have been untimely, see Rule 162[1]), petitioners moved on March 29, 2016, to vacate those decisions on the grounds that newly discovered evidence demonstrates that Thomas Murphy, one of respondent's expert witnesses, lied in both his expert report and his trial testimony as to his expert qualifications.[2]

---

[1]All Rule references are to the Tax Court Rules of Practice and Procedure.

[2]On March 16, 2016, during a trial conducted by another Division of the Court, in Tucker v. Commissioner, T.C. Dkt. No. 12307-04 (filed July 14, 2004), voir dire of Mr. Murphy revealed that he had not updated his curriculum vitae with respect to certain aspects of his employment history and the trials in which he had

(continued...)

**[\*3]** Respondent does not object to our vacating our decisions in these cases. We will vacate our decisions pursuant to Rule 162. At the suggestion of the parties, we have reconsidered our findings and opinion, disregarding Mr. Murphy's expert testimony.[3] On the basis of that reconsideration, for the reasons discussed below, we will reenter our decisions for respondent.

## Background

These cases involve six corporations that entered simultaneously into offsetting long and short currency options and then contributed the option spreads to either AD Investment 2000 Fund LLC (ADI) or AD Global 2000 Fund LLC (ADG) (collectively, LLCs). In less than a year, the corporations disposed of their LLC interests and reported huge tax losses from their investments on the theory that their tax bases in their LLC interests equaled the cost of the long option (or options) that each had contributed to the LLC, unreduced by the offsetting short-option liability (or liabilities) that the LLC had assumed.

---

[2](...continued)
testified in the prior four years. As a result, we did not permit Mr. Murphy to testify in that case.

[3]Although petitioners did not do so, we will treat petitioners as having made an untimely motion pursuant to Rule 161 for us to reconsider our findings or opinion. We grant petitioners leave to so move and hereby grant the motion.

**[*4]**    Respondent examined the LLCs' 2000 returns, and by the FPAAs he made adjustments to partnership items that would eliminate the losses reported by the corporations.  He justified his adjustments in part on the ground that the LLCs had been "formed and availed of solely for purposes of tax avoidance by artificially overstating basis in the partnership interests of its purported partners."  Because the transactions and partnership had "no business purpose other than tax avoidance", they "lacked economic substance", and so, respondent determined, he would disregard them for tax purposes and disallow deductions for the related losses.

We conducted a trial in these cases, and the testimony at trial consisted principally of expert testimony concerning the economics of option spreads.  Respondent called two expert witnesses, Thomas Murphy, who was accepted by the Court as an expert in valuing and trading foreign currency options, and John B. Finnerty, Ph.D., who was accepted by the Court as an expert in finance with a particular expertise in derivatives.  Petitioners called one expert witness, Scott D. Hakala, Ph.D., who was accepted by the Court as an expert on the pricing of currency options with some familiarity with industry practice.

In our Memorandum Opinion AD Inv. 2000 Fund LLC v. Commissioner, at *4, *29-*30, we held that the LLCs should not be recognized as entities for

[*5] Federal tax purposes, and, on that basis, we sustained respondent's adjustments that would eliminate the loss deductions claimed by the corporations. We found:

> The evidence is overwhelming that the LLCs were created and the option spread transactions were executed exclusively for tax avoidance purposes: (1) Mr. Haber [the architect behind the LLCs and the transactions at issue] openly advertised the strategy as a way to generate tax losses, (2) the LLCs themselves engaged in no transactions besides the economic equivalent of putting money in a bank, (3) each corporation joined and resigned from the LLCs within the year, (4) participating in the transactions caused each corporation to completely offset what otherwise would have been a substantial tax liability, and (5) if foreign currency investing and diversification were the goal, there were simpler alternatives with a higher probability of generating profit. [Id. at *28-*29.]

## Discussion

I.     Findings on the Basis of Expert Testimony

Of those five numbered findings, we made only two on the basis of expert testimony, viz, "(2) the LLCs themselves engaged in no transactions besides the economic equivalent of putting money in a bank", and "(5) if foreign currency investing and diversification were the goal, there were simpler alternatives with a higher probability of generating profit." Id. at *29. While Mr. Murphy's testimony supports both of those findings, there is corroborating testimony from one or both of the other expert witnesses.

**[*6]** II.      Essentially Cash Deposits

Mr. Murphy was of the opinion that the option transactions that the LLCs entered into were equivalent to depositing cash in a bank: "The two ADG option spreads [and likewise the two ADI option spreads] were so deep in the money that they were essentially cash deposits." Dr. Finnerty was similarly of the opinion that the option transactions that the LLCs entered into "were so deeply in the money with fixed payoff amounts that they were effectively cash-equivalent positions." Dr. Finnerty was a credible witness, and his testimony alone was sufficient for us to make our finding that the LLCs engaged in no transactions besides the economic equivalent of putting money in a bank. Upon reconsideration, we repeat that finding.

III.      Simpler Alternatives

Likewise, Dr. Finnerty corroborated Mr. Murphy's testimony that the option pairs acquired by the corporations were not particularly good investments. As we reported in our Memorandum Opinion AD Inv. 2000 Fund LLC v. Commissioner, at *18, Dr. Finnerty "credibly testified that neither the option spreads nor their contribution to the LLCs provided the corporations with any additional risk diversification, hedging, or profit potential when compared to purchasing a single long option and holding the option outside of the LLC." On the basis of his

**[*7]** testimony, we found "that FXIS [Mr. Haber's foreign currency investment strategy] was complex and unnecessary. Any actual diversification achieved was minimal, and it could have easily been achieved without an LLC." Id. Also on the basis of his testimony, we found "the yen, the euro, and the Canadian dollar [some of the currencies used to implement FXIS] 'are obtained and traded with ease by lay investors without the need for third-party investment management.'" Id.

Dr. Hakala, petitioners' expert, did not explain why the corporations entered into more complicated transactions when simpler ones with higher probabilities of profit were available, even opining that he did not see anything that suggested an "intent of really beating the market at [a] sophisticated level". Id. at *17-*18 (alteration in original). When asked whether he thought the purpose of the option spreads was actually to profit from foreign currency markets in the light of the fact that the purported tax benefits made profiting immaterial, he stated: "I understand that to some extent, as I would say, the tail wagged the dog". Id. at *18.

Petitioners called Ronald Buesinger as a fact witness. He is an experienced option trader who had assisted Mr. Haber in implementing FXIS. He testified that he had priced the option trades that were necessary to execute FXIS and was very familiar with the economics of the trades. He further testified that he had negotiated the terms of the trades with Lehman Brothers Commercial Corp.

**[*8]** (Lehman), which was both the counterparty and the calculation agent for those trades.[4] He testified that Lehman was uncomfortable with the risk that the option spreads would expire on the "sweet spot" (the remote possibility that, on the expiration of an option pair, the long option is in the money but the short option is not), which risk figured in setting the market spread to be taken into account in determining whether the sweet spot was hit. He acknowledged that, if Mr. Haber was concerned about the net payoff amount from options trades, then a simpler strategy would have been to invest in single (we assume "unpaired") option transactions.

And while the existence of a sweet spot undoubtedly offered the corporations and the LLCs at least the theoretical possibility of a huge payout, Mr. Buesinger analogized the probability of hitting the sweet spot to "hitting the lottery" (or "hitting the head of a pin"). Mr. Murphy was certain that the sweet spot would never be hit. He testified that Lehman, as the calculation agent, had

---

[4]As "counterparty", Lehman bought the options that the corporations sold (it would receive payouts from the corporations if the options expired in the money) and sold the options that the corporations bought (it would have to make payouts to the corporations if the options expired in the money). As "calculation agent", Lehman was responsible for determining the exchange rate price when the options expired. See AD Inv. 2000 Fund LLC v. Commissioner, at *8 n.4.

**[*9]** discretion to pick from a range of prices wider than the sweet spot[5] and that, under the terms of the relevant trade confirmations, neither Lehman or the corporations owed a fiduciary duty to the other. He testified that it would be both commercially reasonable and in its interest (as the counterparty to the transaction) for Lehman to pick a price not at the sweet spot. Mr. Murphy convinced us that Lehman would not have closed a transaction on the sweet spot, AD Inv. 2000 Fund LLC v. Commissioner, at *15, and we found that the option spreads at issue "would never have expired on the 'sweet spot'", id. at *14. There is, however, other testimony that (putting aside Mr. Murphy's testimony) leads us to the same conclusion. Dr. Finnerty was of the opinion that the probability that the paired options would have expired on the sweet spot is "essentially zero." His reasoning was similar to Mr. Murphy's: "As the calculation agent and the counterparty technically exposed to this risk [i.e., payoff if the sweet spot is hit], it seems very unlikely that Lehman would allow the paired options to actually expire within the sweet spot. Lehman would take advantage of the flexibility that it had in determining terms." Dr. Hakala conceded that, as a practical matter, the option

---

[5]More specifically, Mr. Murphy testified that the market spread on exchange rates was three pips wide, and calculation agents such as Lehman would have discretion to pick a price at least within that range. Because the sweet spot for all of the option spreads was only one pip wide, it, in effect, gave Lehman discretion to always pick a price outside of the sweet spot.

**[*10]** spread would never actually expire on the sweet spot. Id. at *16. He added that he had never seen it happen and that, if the option spread was close to being in the money, the parties would close it out before expiration at an agreed price. Id. And while that might mean that a spread owner could profit from a spread that was not actually in the money if it were close to being in the money near to its expiration date (or might enjoy an increased profit if the spread were already in the money and close to the sweet spot near to its expiration date), Dr. Hakala did not quantify the "price" (bonus) that would be agreed upon to avoid the possibility of an option spread's expiring on the sweet spot. For that reason, we cannot do much with his opinion that the parties would price away the risk of a sweet spot hit, and we see no reason to change our fifth numbered finding; i.e., if foreign currency investing and diversification were the goal, there were simpler alternatives with a higher probability of generating profit. Disregarding Mr. Murphy's testimony does not change our assumption expressed in that finding that there were simpler alternatives with a higher probability of generating a profit.

Upon reconsideration of the expert testimony, disregarding Mr. Murphy's testimony, we make the same fifth numbered finding that we made in our Memorandum Opinion AD Inv. 2000 Fund LLC v. Commissioner, at *29, viz, "if

**[\*11]** foreign currency investing and diversification were the goal, there were simpler alternatives with a higher probability of generating profit."

IV.    Conclusion

We will vacate our decisions in order to reconsider our Memorandum Opinion.  Upon reconsideration, we make the same five findings of fact (set forth supra) on which we relied in our Memorandum Opinion.  Id. at \*28-\*29.  Also, we reach the same conclusions that we reached in our Memorandum Opinion:

> The LLCs were created solely for tax avoidance purposes, and, for that reason, we do not recognize them as entities for Federal tax purposes.  Since they are not tax-recognized entities, they are ineligible to be classified as partnerships for Federal tax purposes.  See sec. 301.7701-3(a), Proced. & Admin. Regs.  Because they cannot be classified as partnerships for Federal tax purposes, "there was no partnership loss, and there were no partnership deductions, no contributions to the purported partnership, and no distributions from a partnership to its purported partners.  Adjustment of those [partnership] items to zero is appropriate."  Tigers Eye Trading, LLC v. Commissioner, 138 T.C. at 107.  Likewise, because the LLCs are not tax-recognized entities, neither the corporations nor DGI or Alpha could have any membership interest in the LLCs in which they could have any tax basis.  See Logan Tr. v. Commissioner, 616 F. App'x at 429 (emphasizing that a court "[is] not required to shut its eyes to the legal impossibility of any partner's possessing an outside basis greater than zero in a partnership that, for tax purposes, d[oes] not exist" (quoting United States v. Woods, 571 U.S. ___, ___, 134 S. Ct. 557, 565 (2013))).  Except with respect to the penalties and ADI's interest expense, we sustain respondent's partnership-item adjustments and partnership-level determinations. [Id. at \*29-\*30; alterations in original.]

**[\*12]**  As stated, we will reenter our decisions for respondent.

<u>An appropriate order will be issued,</u>

<u>and decisions will be entered for</u>

<u>respondent</u>.