T.C. Memo. 2017-9

UNITED STATES TAX COURT

NEW MILLENNIUM TRADING, LLC,
AJF-1, LLC, TAX MATTERS PARTNER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 3439-06.                    Filed January 10, 2017.

<u>Nathan J. Cohen</u>, <u>Thomas A. Cullinan</u>, <u>Sheldon M. Kay</u>, and <u>Rebecca M.</u>
<u>Stork</u>, for petitioner.

<u>David B. Flassing</u>, <u>James R. Rich</u>, <u>Johnny C. Young</u>, <u>William C. Bogardus</u>,
and <u>Teri L. Jackson</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, <u>Judge</u>:  Respondent issued a notice of final partnership

administrative adjustment (FPAA) with respect to New Millennium Trading, LLC

[*2] (NMT), for NMT's 1999 tax year. In the FPAA respondent determined, among other things,[1] that NMT was a sham and should be disregarded for Federal income tax purposes. Accordingly, respondent made adjustments to the loss, deduction, contribution, and distribution items NMT reported on its 1999 Form 1065, U.S. Return of Partnership Income (NMT 1999 return), and imposed an accuracy-related penalty under section 6662.[2] A petition for readjustment of partnership items was timely filed by AJF-1, LLC (AJF-1), on behalf of NMT.

The case at hand is one of many involving a particular tax shelter variant promoted by Sentinel Advisors, LLC (Sentinel),[3] where a taxpayer (here, Andrew

---

[1]Respondent made a number of determinations regarding NMT and its partners under the title of "EXHIBIT A--Explanation of Items", which is attached to New Millennium Trading, LLC v. Commissioner (New Millennium I), 131 T.C. 275 (2008), as an appendix.

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the taxable year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are rounded to the nearest dollar.

[3]The cases of Sentinel-promoted Son-of-BOSS transactions ("BOSS" is an acronym for "Bond and Options Sales Strategy", which the Commissioner regards as an abusive tax shelter. See Notice 2000-44, 2000-2 C.B. 255, 256; see also Kligfeld Holdings v. Commissioner, 128 T.C. 192, 194 (2007).) that have been filed in this Court alone are Tigers Eye Trading, LLC v. Commissioner, T.C. Memo. 2009-121, Sterling Trading Opportunities, LLC v. Commissioner, T.C. Memo. 2007-339, and Topaz Trading LLC v. Commissioner, T.C. Memo. 2007-339; Asuma Trading Ventures, LLC v. Commissioner, docket No. 26772-06 (filed
(continued...)

[*3] Filipowski) contributes offsetting options to a limited liability company (treated as a partnership for income tax purposes) to get an artificially high basis in a partnership interest, receives euro and stock in disposition of that interest, and then claims a significant tax loss from the disposition of the euro and stock, offsetting millions of dollars of gain realized on the sale of an unrelated business interest.  Deductions for such losses have consistently been disallowed, and nothing about this case warrants a different result.

## FINDINGS OF FACT

Background

In 1987 Mr. Filipowski founded Platinum Technology, Inc. (Platinum), a computer software company in Chicago, Illinois.  Platinum developed, marketed, and supported software products for enterprise systems management, data warehousing, and database management.  As of February 1999 Mr. Filipowski was

---

³(...continued)
Dec. 27, 2006); Sapphire Traders, LLC v. Commissioner, docket No. 19067-09 (filed Aug. 10, 2009); Eagle Trading Opportunities, LLC v. Commissioner, docket No. 9733-05 (stip. dec. entered Jan. 23, 2009); Pinnacle Trading Opportunities, LLC v. Commissioner, docket No. 19291-05 (order and dec. entered July 11, 2013); and Oak Leaf Trading, LLC v. Commissioner, docket No. 1896-06 (stip. dec. entered July 29, 2008).  See also Diebold v. Commissioner, T.C. Memo. 2010-238, in which Sentinel appears to have played a facilitating role in creating artificial losses claimed on the sale of corporate assets, resulting in a deficiency in Federal corporation income tax and accuracy-related penalties not contested by the selling corporation.

[*4] Platinum's president and chief executive officer and owned 4,652,068 voting shares.

By May 1999 Platinum had reached $1 billion in revenue and had become the eighth-largest computer software company in the world. Platinum was acquired by Computer Associates International, Inc., in March 1999 for approximately $3.5 billion (Platinum sale). Mr. Filipowski expected to receive combined capital gains and ordinary income of $110 million from the Platinum sale.

Creation of the Spread Transaction

Sentinel, formed by Ari Bergmann and Abraham Pfeiffer in 1997, was a hedge fund manager in New York. The Ari Bergmann Revocable Trust was the managing member of Sentinel. Mr. Bergmann was the trustee of the Ari Bergmann Revocable Trust. Mr. Bergmann managed Sentinel. Sentinel owned and controlled New Vista, LLC (New Vista), and Shomrim, LLC (Shomrim), and owned 75% of and controlled Shakti Advisors, LLC (Shakti).

Mr. Bergmann graduated from Towson State University with a major in accounting, and he is a certified public accountant (C.P.A.). Before managing Sentinel, he worked at Price Waterhouse, Drexel Burnham Lambert Trading, and Bankers Trust. Mr. Bergmann began work at Bankers Trust in 1989 at the U.S.

[*5] Interest Rate Derivatives trading desk and managed this unit in 1992 and 1993. During this time he was active in arbitrage and in the development of structured notes, index-amortizing swaps, times swaps, binary options, and other derivative products. From 1993 to 1997 he headed the Transaction Development Group (TDG), a unit that he founded within Bankers Trust. TDG was active in the application of derivative techniques in the privatization of a number of European state-owned companies. TDG also advised clients on mergers and acquisitions, tax transactions, and hedge fund structures. Mr. Bergmann formed Sentinel after leaving his position as senior managing director at Bankers Trust.

BDO Seidman, LLP (BDO), is an accounting firm. During 1999 BDO's management encouraged its employees to sell tax shelters to wealthy individuals and established a bonus program for its employees who sold these tax shelters. During 1999 BDO had a practice group called "Tax Solutions Group" (TSG), consisting of 20 to 40 BDO partners. TSG was responsible for designing, selling, and implementing tax shelters.

One such tax shelter was the "spread transaction". BDO and Sentinel co-developed the spread transaction and structured it to create an ordinary loss, a capital loss, or both. Between May and December 1999 BDO and Sentinel marketed the spread transaction to clients who had income of at least $15 million.

**[\*6]**   The spread transaction consisted of the following steps:  (1) creation of an

option[4] spread by the simultaneous purchase of a call option on an asset at a

certain strike price and the sale of a call option on the same asset but at a slightly

higher strike price, (2) transfer of the option spread and cash to a partnership, (3)

claiming a basis in the partnership equal to the premium purportedly paid for the

purchased option and cash contributed, without reduction for the offsetting

liability related to the sold option,[5] (4) withdrawal from the partnership and receipt

of a distribution of property with a basis substituted from the basis claimed in the

partnership, and (5) disposition of the distributed property.  For an ordinary loss

on the spread transaction the participant would receive euro while for a capital

loss the participant would receive Xerox stock.

Fees payed by clients to engage in the spread transaction were split among

Sentinel, BDO, and AIG International, Inc. (AIG), a foreign currency dealer.

---

[4]An option is a contract that gives the buyer the right, but not the obligation, to buy or sell an asset at a predetermined price (the strike price).

[5]A tax loss was anticipated because at the time these transactions took place, an investor's basis in a partnership was ordinarily not decreased by the amount of a contingent liability contributed to or assessed by a partnership.  See Helmer v. Commissioner, T.C. Memo. 1975-160 (holding that a contingent obligation, such as an obligation under a sold option, was not a liability under sec. 752 because a partnership's obligation under the option does not become fixed until the option is exercised).

**[*7]** Sentinel generally collected its share and BDO's share of the fees via consulting agreements between clients and New Vista or Shomrim. Sentinel generally paid BDO 40% of the fees received through the consulting agreements and kept the remaining 60%. AIG directly received a fee for serving as the counterparty to the spread transaction.

Search for a Tax Strategy

Soon after the Platinum sale, several law and accounting firms selling tax strategies approached Mr. Filipowski and other Platinum executives. In March 1999 Mr. Filipowski called Katten Muchin & Zavis (Katten) regarding KPMG and Ernst & Young (E&Y) tax strategies. In April 1999 another Platinum executive sent a request to Alex. Brown and Jenkens & Gilchrist (Jenkens) to present their respective tax strategies.

Mr. Filipowski engaged Katten, which had represented Mr. Filipowski and Platinum for years, to review and advise him on which tax strategy to choose. Katten assigned Arnold Harrison,[6] a partner specializing in tax law, to advise Mr. Filipowski. Mr. Harrison had over 25 years of experience in tax law, most of which was spent at Katten. Katten billed Mr. Filipowski on an hourly basis for its

---

[6]Mr. Harrison passed away on March 16, 2010. His depositions taken on February 21 and August 19, 2007, have been admitted into evidence.

[*8] work.  Mr. Harrison compared the tax strategies offered by KPMG, E&Y, Jenkens, and BDO.

On May 27, 1999, Mr. Filipowski and Mr. Harrison met with Paul Daugerdas, a Jenkens attorney, at the Jenkens office in Chicago to discuss a tax strategy.  Later that day Mr. Filipowski and Mr. Harrison went to Robert Greisman's office at BDO to discuss the spread transaction (May meeting).  Mr. Greisman was a BDO tax partner and TSG member.  Mr. Greisman became aware of the Platinum sale and asked a friend to introduce him to Mr. Filipowski. Mr. Greisman arranged for the May meeting among himself, Mr. Filipowski, Mr. Harrison, and Mr. Bergmann.  The four men spoke for the first time at the May meeting, with Mr. Bergmann participating via telephone.  During the May meeting Mr. Bergmann gave an overview of the spread transaction.

On May 28, 1999, BDO sent Mr. Filipowski and Mr. Harrison a sample marketing opinion that BDO had prepared for potential investors in the spread transaction.  The marketing opinion laid out the steps of the spread transaction and went into detail about its tax consequences.  The marketing opinion summarized the Federal income tax consequences of the spread transaction as more likely than not that--

**[*9]** 1. You should recognize gain on the transfer of the Purchased Call Option to the Partnership. You will not recognize any loss on the contribution of the Purchased Call Option to the Partnership.

2. Your basis for the Partnership interest should be equal to your basis in the Purchased Call Option, reduced by the amount of liabilities assumed by the Partnership. The sold call option should not be considered a liability for purposes of section 752.

3. Your share of any loss incurred by the Partnership should be deductible by you, and should not be subject to the passive activity loss rules.

4. You should not recognize gain or loss on the receipt of foreign currency from the Partnership in exchange for your Partnership interest.

5. The basis of the foreign currency received in liquidation of your Partnership interest should equal your basis for the Partnership interest.

6. The gain or loss recognized on your sale of the foreign currency should be treated as ordinary income or loss.

June Meeting

On June 9, 1999, a meeting (June meeting) was held at Platinum's offices among Messrs. Greisman, Bergmann, Filipowski, Harrison, a partner at Katten, Vincent Aquilino, and four other Platinum executives, Michael Cullinane, Paul Tatro, Paul Humenansky, and Larry Freedman (Platinum executives). At the June meeting, Mr. Bergmann gave a more detailed presentation of the spread transaction using PowerPoint software (Sentinel presentation). The Sentinel presentation laid out the steps of the spread transaction.

**[\*10]** The Sentinel presentation included an example of a spread transaction in which a participant transferred an option spread costing $350,000[7] and $300,000 cash to a partnership (example). The example showed how transfer of an option spread costing $350,000 to a partnership could create a tax basis of $60 million, approximately 170 times the cost of the option spread. The potential net profit in the example was $500,000. The Sentinel presentation did not mention the likelihood of making the potential net profit.

In August 1999 Mr. Filipowski decided to execute the spread transaction. The spread transaction Mr. Filipowski executed (NMT spread transaction) followed the steps listed in the Sentinel presentation.

Messrs. Filipowski, Greisman, and Harrison all understood that the NMT spread transaction had to be completed in 1999 to offset Mr. Filipowski's income from the Platinum sale.

Setup of Entities

In May 1999 William Doyle, an attorney at Katten, formed the AJF-1999 Trust (trust). Mr. Doyle named himself and Mr. Filipowski cotrustees, and named

---

[7]The cost of the hypothetical option spread is calculated by netting the premium of the long call option, $60 million, with the premium of the short call option, $59.65 million.

[*11] Mr. Filipowski as the grantor and sole beneficiary of the trust. The trust was set up to be used in connection with the tax strategy.

Mr. Harrison organized AJF-1 on July 1, 1999, as an Illinois limited liability company. The sole member of AJF-1, which was disregarded for tax purposes, was the trust. Mr. Harrison served as AJF-1's registered agent.

Fees for the NMT Spread Transaction

Mr. Filipowski negotiated the fees for the NMT spread transaction with Mr. Bergmann. During negotiations, Mr. Filipowski and Mr. Harrison informed Mr. Bergmann and Mr. Greisman that Mr. Filipowski was looking at competing tax strategies. Mr. Filipowski and Mr. Bergman negotiated the fees (fixed fees) for the NMT spread transaction as a percentage of the amount of tax Mr. Filipowski wanted to shelter. Mr. Harrison suggested to Mr. Filipowski that he increase the size of his tax strategy from $110 million, the amount that Mr. Filipowski expected to receive from the Platinum sale, to $120 million. Mr. Filipowski decided the size of his tax strategy would be $120 million. It was agreed that the fixed fees for the spread transaction would be 3.5% of $120 million, i.e., $4.2 million.

The $4.2 million in fixed fees consisted of the following:

[*12]

| Fee | Amount |
|---|---|
| Shomrim consulting fee | $3,570,000 |
| BDO tax opinion | 30,000 |
| AIG account opening fee | 600,000 |
| Total | 4,200,000 |

The fixed fees remained the same whether or not Mr. Filipowski did any activity with Shomrim outside of the NMT spread transaction. Sentinel and BDO agreed to split the Shomrim consulting fee and the BDO tax opinion fee 60/40, respectively.

Shomrim Agreements

On August 15, 1999, Mr. Filipowski and Shomrim executed an investment advisory and consulting agreement (Shomrim agreement). The Shomrim agreement specified that Mr. Bergmann, through Shomrim, would advise Mr. Filipowski, AJF-1, and the trust. The $3,570,000 fixed fee due under the Shomrim agreement was payable as follows: $70,000 in August 1999 and $100,000 each subsequent month for the next 35 months. The Shomrim agreement also provided Shomrim with authority to invest assets Mr. Filipowski placed in a discretionary

[*13] account.  The Shomrim agreement charged management and incentive fees[8] (Shomrim variable fees) with respect to assets that were placed in the discretionary account.

On the same day Mr. Filipowski obtained a termination agreement (termination agreement) signed by Mr. Bergmann.  The termination agreement allowed Mr. Filipowski to terminate the Shomrim agreement if Shomrim were unable to transfer the option spread to a partnership while the sold option position was out of the money.[9]

---

[8]An annual management fee of 2% of the value of property covered by the Shomrim agreement, and an incentive fee of 20% of any increase in the value of the property covered by the Shomrim agreement, subject to a 6% hurdle, meaning that no incentive fee was owed if the cumulative annual increase in value was less than 6%.

[9]Options are often referred to as being "at the money", "in the money", or "out of the money".  An option that is "at the money" has its strike price equal to the market price of the underlying asset.  An option is "in the money" when the option's strike price is less than the current market price of the underlying asset.  If the value of the underlying asset is greater than the exercise price for a call option or less than the exercise price for a put option, that option is said to be "in the money".  In this case, it is advantageous to the owner of the option to exercise his or her right under the option as opposed to acquiring or selling such assets in the stock market.  An option is "out of the money" when it would be disadvantageous to exercise the option, as opposed to acquiring or selling the assets in the stock market.

**[*14]** <u>AIG Agreements</u>

On August 3, 1999, AJF-1 and AIG entered into a letter agreement (AIG agreement), which governed AJF-1's transactions with AIG.  Under the AIG agreement, with AIG's approval AJF-1 could assign transactions to a different counterparty.  Provision 11.1 of the AIG agreement states in part:

> This Agreement may not be assigned by either party in whole or in part without the prior written consent of the other party.  Transactions may be assigned to a new counterparty solely upon credit and legal approval of the new counterparty by AIG, such approval to occur in writing prior to any such assignment.

The AIG agreement had no provision with respect to any fee related to opening a trading account or trading in foreign currency options.  AJF-1, however, paid AIG a $600,000 account opening fee.

<u>Option Spread</u>

On August 19, 1999, at Shomrim's direction, AJF-1 entered into an option spread with AIG as the counterparty.  The option spread comprises a purchased European-style[10] call option on the euro (purchased option) and a sold European-style call option on the euro (sold option).  The terms of the purchased option were

---

[10]A European-style option is an option that can be exercised only on its expiration date.

[*15] identical to the terms of the sold option except for a 10-pip[11] difference in the strike price. The component options of the option spread each had an expiration date of August 21, 2000, and a notional value of €2,300,591,444. The purchased option had a strike price of 1.0880 USD/EUR and the sold option had a strike price of 1.0890 USD/EUR. The USD/EUR rate was approximately 1.0596 on August 19, 1999. The stated premium for the purchased option was $120 million (purchased option premium); the stated premium for the sold option was $118.8 million (sold option premium) (collectively, option spread premiums). AJF-1 paid AIG $1.2 million (net premium), the net amount of the option spread premiums, for the option spread. The option spread premiums were priced by traders at AIG.

The option spread had three possible outcomes depending on the EUR/USD spot rate at the time of expiration. First, if the spot rate were below 1.0880 at expiration, the option spread would expire worthless and AJF-1's loss would have been the net premium paid. Second, if the spot rate were at or above 1.0890, the spread option would have been worth a net payoff of $2,300,591, or net profit of

_____

[11]A pip is the smallest price increment that the price of the underlying asset can move. One pip is one one-hundredth of a cent.

[*16] $1,100,591.[12]  Third, if the spot rate had been between 1.0881 and 1.0889 at expiration, the option spread would have been worth between $230,059 and $2,070,532, or a net return between a loss of $969,941 and a profit of $870,532.

The option spread could be restruck provided that AIG was protected from credit risk and consented to restriking.  For the purchased option and the sold option to be separated, AIG would have to provide approval and AJF-1 or NMT would have to post the margin between the option spread premiums.  Neither AJF-1 nor NMT could acquire or hold the purchased option or the sold option by itself, as each lacked the required funds.[13]

AIG sent Mr. Filipowski two separate confirmations for AJF-1's respective purchased option and sold option (original confirmations).  The confirmations were subsequently amended and resent on or around September 23, 1999 (amended confirmations).  The original confirmations and the amended confirmations were identical except for the following provision.  The original confirmations stated:

---

[12]A $2,300,059 net payoff less the $1.2 million net premium paid by AJF-1.

[13]For example, the margin amount necessary to separate the purchased option from the sold option on September 30, 1999, was $185,414,534, and NMT had only $1,070,000 cash on hand.

[*17] "In the money" amount
The excess of the strike price over the spot price, multiplied by the USD amount of the option.

The amended confirmations read:

"In the money" amount
Put options:
The excess of the strike price over the spot price, multiplied by the EUR amount on the option.
Call options:
The excess of the spot price over the strike price, multiplied by the EUR amount on the option.

With the amended confirmations, the maximum net profit from the option spread, before fees, was approximately $1.1 million.

NMT Formation

On August 6, 1999, NMT, was formed as a Delaware limited liability company. NMT's original members were Banque Safra-Luxembourg, S.A. (Banque Safra), Fidulex Management, Inc. (Fidulex), and Shakti. Banque Safra contributed $300,000 and signed an NMT subscription agreement on September 17, 1999. Fidulex contributed $150,000 and signed an NMT subscription agreement on October 18, 1999. Shakti contributed $20,000 and was the managing member of NMT.

NMT's partnership agreement provided that Shakti, as managing member, received three types of fees (NMT variable fees) from the other members: (1) a

[*18] management fee of 2% annually on the value of their capital accounts, (2) an incentive fee of 20% of any increase in the value of their capital accounts, which was not subject to any hurdle, and (3) a 5% early withdrawal fee if a they withdrew from NMT within 12 months.

AJF-1 Joins NMT

On September 15, 1999, Mr. Filipowski, on behalf of AJF-1, signed a subscription agreement for NMT (NMT subscription). The following day AJF-1 transferred $600,000 to NMT. AJF-1 initially attempted to transfer the option spread to NMT on September 16, 1999, by signing an assignment and assumption agreement (assignment agreement) but was unable to do so, presumably because of the discrepancy between the original confirmations and the amended confirmations. Once the amended confirmations were subsequently prepared and sent to AJF-1, AJF-1 assigned the option spread to NMT. AIG consented to the assignment of the option spread to NMT.

Sometime between November 15 and 19, 1999, Mr. Filipowski signed new copies of the NMT subscription and assignment agreement and backdated the new assignment agreement as of September 30, 1999. NMT assigned the option spread a value of $1,172,417 as of September 30, 1999, and credited AJF-1's capital account by that amount. At the time AJF-1 transferred the option spread to NMT,

**[*19]** it was out of the money. NMT determined AJF-1's initial capital account to be $1,772,417, consisting of the option spread and the $600,000 transferred on September 16, 1999.

After AJF-1 joined NMT, the members' interests were as follows: AJF-1 had 79.04%, Shakti had .89%, Fidulex had 6.69%, and Banque Safra had 13.38%.

NMT Trading Activity

NMT entered into a variety of transactions in financial markets on behalf of its members. On average the positions were short term, unprofitable, and small relative to the option spread entered into and contributed by AJF-1. Most of the transactions were opened and closed out on the same day or the following day.

The only transaction of significance was a reverse knockout option NMT purchased from AIG on October 6, 1999, for a premium of $189,642, when the USD/EUR spot rate was 1.0724. The reverse knockout option had an expiration date of October 13, 2000, and a notional value of €114.4 million. It had a strike price of 1.0685 USD/EUR and a knockout price of 1.122 USD/EUR. This means that if the spot rate reached or exceeded 1.122 USD/EUR at any time before expiration of the reverse knockout option, it would immediately lose all value. If the exchange rate went very close to 1.122 USD/EUR without ever exceeding that level, the reverse knockout option could pay off several million dollars.

[*20] Respondent's expert, Dr. Brown, opined that the most likely outcome for the reverse knockout option is that it would expire worthless. It was sold back to AIG on December 10, 1999, for $147,000, a loss of $42,642.

NMT Withdrawals

On December 2, 1999, AJF-1 requested to withdraw and redeem its interest in NMT. On December 15, 1999, AJF-1 officially withdrew from NMT. Sentinel communicated to AJF-1 that its interest in NMT, less a 5% withdrawal fee, would be sent to AJF-1 in currency and equity securities by December 22, 1999.

On December 22, 1999, NMT transferred to AJF-1 €617,664 and 21,454 shares of Xerox stock valued at $623,223 and $445,171, respectively. AJF-1's withdrawal distribution was $56,231 less than AJF-1's NMT capital account on December 15, 1999, because of the 5% withdrawal fee.

On December 17, 1999, NMT closed out the option spread. NMT remained in existence until October 2000. Banque Safra and Fidulex withdrew in October 2000 and received cash in exchange for their NMT interests. NMT terminated operations as of December 31, 2000, and filed a certificate of cancellation in 2001. Accordingly, NMT did not have a principal place of business when the petition was filed.

**[*21]** AJF-1 Disposes of Property

On December 22, 1999, AJF-1 sent a fax to Salomon Smith Barney and AIG requesting to sell all of its Xerox stock and €530,000 of the €617,664, respectively. The next day Salomon sold AJF-1's 21,454 shares of Xerox stock for $464,191. On or about December 29, 1999, AIG sold €530,000 of AJF-1's for $537,420. The €87,664 AJF-1 retained had a value of $88,891 as of December 22, 1999.

Total Fees Paid for the NMT Spread Transaction

In 1999 and 2000 Mr. Filipowski paid $570,000 and $1,100,000, respectively, under the Shomrim agreement. In 2000 Mr. Filipowski paid BDO $30,000. In 2001 Mr. Filipowski paid $991,403 to terminate the Shomrim agreement. Mr. Filipowski's total fees paid with respect to the NMT spread transaction were $3,479,822, calculated as follows:

| Paid to | Amount |
| --- | --- |
| Shomrim | $2,661,403 |
| AIG | 600,000 |
| BDO | 30,000 |
| NMT (withdrawal fee) | 53,419 |
| Katten | 135,000 |
| Total | 3,479,822 |

[*22] <u>Tax Opinion</u>

BDO initially referred Mr. Filipowski and Mr. Harrison to the law firm Curtis Mallet with the expectation that that firm would provide Mr. Filipowski with a tax opinion. Mr. Harrison could not work with Curtis Mallet on the opinion that it was going to issue to Mr. Filipowski. Mr. Greisman and Larry Cohen, a BDO and TSG member, discussed whether BDO could issue an opinion to Mr. Filipowski incorporating the changes Mr. Harrison sought on a draft Curtis Mallet opinion. On March 20, 2000, BDO ultimately issued a formal tax opinion (BDO tax opinion) to Mr. Filipowski which reflected Mr. Harrison's input and changes. Mr. Filipowski paid $30,000 for the BDO tax opinion.

<u>Other NMT Members</u>

Sentinel, through Shomrim, expected to receive a fixed fee of $2,142,000[14] for selling the NMT spread transaction and implementing it and to receive Shomrim variable fees from property placed in AJF-1's discretionary account. Additionally, Sentinel, through Shakti, expected to receive NMT variable fees. Shakti lost about $5,000 in 1999 from its participation in NMT, of which 75% passed through to Sentinel.

---

[14] 60% of the $3,570,000 fixed fee under the Shomrim agreement.

[*23] NMT is one of a number of LLCs managed by Sentinel, or an affiliate of Sentinel, to which certain members contributed or transferred foreign currency options as part of a spread strategy in 1999 and/or 2000. In 1999 Shomrim and New Vista passed through to Sentinel over $17 million and the 26 limited liability companies (Sentinel LLCs) listed on Sentinel's 1999 return passed through a total net loss of $43,929, with no single Sentinel LLC passing through a gain or loss greater than $16,000. Banque Safra participated as a nominee in 32 of the 33 Sentinel LLCs and Fidulex, or its parent company, participated in 4.

Banque Safra and Fidulex did not participate in NMT on their own behalf. The record does not reveal the persons (nominee participants) on whose behalf Banque Safra and Fidulex transferred cash to NMT. The record does not show whether the nominee participants had any income from the United States or had any U.S. tax issues.

Tax Reporting

The trust's Form 1041, U.S. Income Tax Return for Estates and Trusts (trust 1999 return), reported a $59,827,262 ordinary loss on the sale of the €530,000 and

[*24] a $49,786,580 capital loss on the sale of 21,454 shares of Xerox stock.[15] The trust return also claimed a $633,571 passthrough loss from NMT.

BDO prepared Mr. Filipowski's 1999 tax returns. Mr. Filipowski, on his 1999 Form 1040, U.S. Individual Income Tax Return (Filipowski 1999 return), offset Platinum wage income of $62,099,865 with $59,827,262 in claimed losses from the sale of euro and offset his long-term capital gains of $53,989,700 from the Platinum sale with $49,786,580 in claimed losses from the Xerox stock. The Filipowski 1999 return claimed a $633,571 passthrough loss from the trust, which originated with NMT. The Filipowski 1999 return reported a tax liability of $6,726,497.

Mr. Filipowski filed a Form 1040X, Amended U.S. Individual Income Tax Return, for his 2000 tax year that claimed a $9,905,079 loss deduction on the €87,664 AJF-1 disposed of in 2000.

NMT retained Untracht & Associates (Untracht) to prepare and file the NMT 1999 return. On the NMT 1999 return NMT reported that AJF-1 was a

---

[15]The trust reported a basis of $60,364,682 and a gross sale price of $537,420 for €530,000 and a basis of $50,250,771 and a gross sale price of $464,191 for the 21,454 shares of Xerox stock. The bases reported by the trust were calculated under sec. 732(b), providing that the basis of property distributed to a partner in liquidation of a partnership interest is equal to the partner's adjusted basis in the partnership.

[*25] partner in NMT, made a contribution of $1,772,417, and received a partnership withdrawal distribution of $1,124,620. The NMT 1999 return reported total contributed capital of $2,242,417, ending capital of $406,044, and a net loss of $711,753.

On March 10, 2001, NMT filed its year 2000 Form 1065 marked "Final", reporting no assets and liabilities and all participants having withdrawn. In 2001 a certificate of cancellation was filed for NMT.

FPAA

On September 21, 2005, respondent issued the FPAA to NMT. The FPAA made a number of adjustments: (1) disallowing NMT's claimed operating loss deduction of $669,206 and other deductions of $18,712 and (2) decreasing to zero the capital contributions and distributions of property other than money accounts. The FPAA indicated these changes in chart form. Each adjustment was shown in a chart with an "adjustment", "as reported", and "corrected" box accompanying each individual adjustment. The chart included figures for each of the above adjustments but showed asterisks instead of figures as to outside partnership basis.

Respondent determined, among other things, that NMT was a sham and that penalties under section 6662 are applicable.

**[*26]** Procedural Matters

On September 21, 2005, respondent timely mailed a copy of the FPAA to Shakti, which at the time was NMT's tax matters partner (TMP). AJF-1, a notice partner withing the meaning of section 6231(a)(8), timely filed the petition upon which this case is based. On the date the petition was filed, NMT did not exist. By order dated June 13, 2007, AJF-1 was appointed TMP for NMT.

NMT's case was tried at a special trial session in Atlanta, Georgia, in February 2015. The record consists of the pleadings, stipulations of facts with attached exhibits,[16] oral testimony, and exhibits received at trial.

OPINION

## I. Jurisdiction Under TEFRA

Under the unified partnership audit and litigation procedures of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, sec. 402(a), 96 Stat. at 648, the tax treatment of any partnership item, except as otherwise provided in subchapter C, must be determined at the partnership level. Sec. 6221. Section 6226(a) authorizes a TMP to file a petition for readjustment of

---

[16]At trial we stated that a document not admitted will be disregarded if the party wishing to rely upon it failed to argue and address the remaining objections to the document in his opening brief. Respondent has relied on documents not admitted in the record, and he has failed to address petitioner's objections in his brief.

[*27] partnership items within 90 days after the date on which an FPAA is mailed to the TMP. In a partnership-level proceeding filed pursuant to section 6226(a), this Court has jurisdiction to readjust all partnership items for the partnership year to which the FPAA relates and to readjust the allocation of such items among the partners. Sec. 6226(f). A "partnership item", in substance, is an item "required to be taken into account" by the partnership for tax purposes, to the extent those items are more appropriately determined at the partnership level than at the partner level. Sec. 6231(a)(3). This Court has jurisdiction to determine whether a partnership is a sham, lacks economic substance, or otherwise should be disregarded for tax purposes. See Tigers Eye Trading, LLC v. Commissioner, 138 T.C. 67, 98-99 (2012) (citing Petaluma FX Partners, LLC v. Commissioner, 591 F.3d 649, 653-654 (D.C. Cir. 2010), aff'g in part, rev'g in part, vacating and remanding in part, 131 T.C. 84 (2008)), aff'd in part, rev'd in part, and remanded sub nom. Logan Tr. v. Commissioner, 616 F. App'x 426 (D.C. Cir. 2015).

A nonpartnership item is an item that is not a partnership item and whose tax treatment is determined at the partner level. Sec. 6231(a)(3) and (4). An affected item is any item to the extent it is affected by a partnership item, the tax treatment of which is determined in a partner-level proceeding after the underlying

[*28] partnership item(s) is determined at the partnership level.[17] Sec. 6231(a)(5); Jenkins v. Commissioner, 102 T.C. 550, 554 (1994).

II.     Burden of Proof

Petitioner bears the burden of proof to overcome respondent's determinations. See Rule 142(a); Monahan v. Commissioner, 109 T.C. 235 (1997). Respondent bears the burden of production but not the burden of proof on the applicability of the penalty under section 6662(a). Sec. 7491(c); Palm Canyon X Invs., LLC v. Commissioner, T.C. Memo. 2009-288, slip op. at 78.

III.    Validity of NMT for Federal Income Tax Purposes

The essential question in determining whether an entity is recognized for Federal income tax purposes is whether the parties intended to join together for the present conduct of the enterprise. Commissioner v. Culbertson, 337 U.S. 733, 742 (1949). "A partnership is generally said to be created when persons join together their money, goods, labor, or skill for the purpose of carrying on a trade, profession, or business and when there is community of interest in the profits and losses." Commissioner v. Tower, 327 U.S. 280, 286 (1946); see also ASA

_____

[17]There are two types of affected items: (1) computational affected items that follow from the result of a partnership-level proceeding and (2) affected items that may require factual development at the partner level. See N.C.F. Energy Partners v. Commissioner, 89 T.C. 741, 744-745 (1987).

[*29] <u>Investerings P'ship v. Commissioner</u>, 201 F.3d 505, 513 (D.C. Cir. 2000), <u>aff'g</u> T.C. Memo. 1998-305. The pursuit of a business activity in furtherance of tax avoidance--which is dependent on the existence of an entity to accomplish that purpose--will not give substance to an entity formed to achieve that purpose. <u>See, e.g.</u>, <u>ASA Investerings P'ship v. Commissioner</u>, 201 F.3d at 513 n.6; <u>see also</u> <u>TIFD III-E, Inc. v. United States</u>, 459 F.3d 220, 232 (2d Cir. 2006) ("The IRS's challenge to the taxpayer's characterization is not foreclosed merely because the taxpayer can point to the existence of some business purpose or objective reality in addition to its tax-avoidance objective."). We therefore must ask specifically whether the parties intended to join together as partners to conduct business activity for a purpose other than tax avoidance.

Petitioner argues that NMT meets the test for partnership recognition under <u>Culbertson</u>, and that it "need only show that * * * [the partners] had a business purpose for joining together to conduct their business activity". On brief petitioner contends that NMT was a valid partnership because "all of its partners were at least partially motivated to earn a profit by joining the partnership; it engaged in substantial business activity that held a reasonable likelihood of earning a profit; and the counterparties to its trading activities treated it as a valid partnership".

**[*30]** Respondent argues that NMT should be disregarded as a partnership under the <u>Culbertson</u> line of cases and the antiabuse rules promulgated under section 1.701-2, Income Tax Regs.[18] Respondent contends that the Court of Appeals for the D.C. Circuit has established a bright-line test that a partnership must pass to be respected. That test requires the entity to show that "the parties intended to join together as partners to conduct business activity for a purpose other than tax avoidance". Additionally, respondent asserts that even if the Court of Appeals did not have a bright-line test, NMT should be disregarded as a partnership under any facts and circumstances sham partnership test. In support, respondent enumerates the following factors: (1) partner(s) withdrew after a short period, (2) partner(s) withdrew consistent with a plan, (3) a single-purpose entity was set up just to conduct the transaction at issue, (4) no consideration was given to structuring the transaction other than how it was structured, and (5) the transaction could have been done at a lower cost without the partnership.

---

[18]Petitioner argues that sec. 1.701-2, Income Tax Regs., does not provide any legal basis that did not already exist in the common law for treating NMT as a sham, and if it does, it is invalid. Though respondent cites sec. 1.701-2, Income Tax Regs., as a ground for disregarding NMT, we do not rely on it and see no need to address petitioner's argument.

[*31] We have made findings consistent with respondent's averments, and we are not persuaded by petitioner's arguments to the contrary. The evidence is overwhelming that NMT was created exclusively for tax avoidance purposes.

AJF-1 participated in NMT for a brief time, withdrawing three months after it executed the subscription agreement for the first time. All of the other NMT participants withdrew in just over a year after NMT was formed. NMT was created in August 1999 and terminated operation in October 2000. Mr. Filipowski's interactions with NMT were preplanned and followed the spread transaction steps outlined in the Sentinel presentation. Mr. Filipowski set up two single-purpose entities, the trust and AJF-1, to engage in the NMT spread transaction.

Nothing in the record suggests that consideration was given to conducting NMT's activity through anything other than a partnership, because a partnership was necessary to claim the tax benefits. The transactions undertaken by AJF-1 could have been undertaken outside of NMT at a lower cost. AJF-1 could have directly engaged in the same type of activity that NMT engaged in without contracting to pay $4.2 million in fixed fees. By keeping the option spread under the Shomrim agreement, AJF-1 could have invested under Mr. Bergmann's management at a lower cost without using NMT. The Shomrim variable fees were

[*32] less than the NMT variable fees, and Mr. Bergmann managed both NMT and the activity under the Shomrim agreement.

The structure of the NMT spread transaction is not novel, and we have consistently disregarded entities that attempt to generate artificial losses by exploiting the partnership tax rules. See AD Inv. 2000 Fund, LLC v. Commissioner, T.C. Memo. 2016-226; 436, Ltd. v. Commissioner, T.C. Memo. 2015-28; Markell Co. v. Commissioner, T.C. Memo. 2014-86; 6611, Ltd. v. Commissioner, T.C. Memo. 2013-49; Palm Canyon X Invs., LLC v. Commissioner, T.C. Memo. 2009-288; see also New Phoenix Sunrise Corp. v. Commissioner, 132 T.C. 161 (2009) (disallowing the losses because the "transaction lacked economic substance"), aff'd, 408 F. App'x 908 (6th Cir. 2010); Humboldt Shelby Holding Corp. v. Commissioner, T.C. Memo. 2014-47 (similar), aff'd per summary order, 606 F. App'x 20 (2d Cir. 2015). Each scheme involved an entity (partnership or LLC) whose sole purpose was to provide its members with a high-basis membership interest to be disposed of at a loss; or, on its redemption, to put high-basis entity assets into the hands of the member, who would then dispose of them at a loss.

As an alternative argument, petitioner contends that NMT must be respected as a partnership because at least two of its members, Banque Safra and Fidulex,

[*33] invested in NMT to earn profits from a rise in the euro. Large guaranteed tax benefits combined with the possibility of making a relatively small profit, however, do not create a valid business purpose. See Humboldt Shelby Holding Corp. v. Commissioner, at *16. The other foreign currency trades that NMT made were significantly smaller in amount compared to the option spread and were an obvious attempt to legitimize NMT's status as a partnership. The only significant trade, the reverse knockout option, was most likely to expire worthless. Moreover, petitioner presented no evidence other than self-serving testimony to the effect that Banque Safra and Fidulex had a legitimate profit motive. We are not required to accept self-serving and uncorroborated testimony, and we decline to do so here. See Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).

NMT was created solely for tax avoidance purposes, and, for that reason, we do not recognize it as an entity for Federal tax purposes. Since it is not a tax-recognized entity, it is ineligible to be classified as a partnership for Federal tax purposes. See sec. 301.7701-3(a), Proced. & Admin. Regs. Because NMT cannot be classified as a partnership for Federal tax purposes, "there was no partnership loss, and there were no partnership deductions, no contributions to the purported partnership, and no distributions from a partnership to its purported partners. Adjustment of those [partnership] items to zero is appropriate." Tigers Eye

[*34] <u>Trading, LLC v. Commissioner</u>, 138 T.C. at 107. Furthermore, because NMT is not a tax-recognized entity, none of its members could have any membership interest in NMT in which they could have any tax basis. See <u>Logan Tr. v. Commissioner</u>, 616 F. App'x at 429 (emphasizing that a court "[is] not required to shut its eyes to the legal impossibility of any partner's possessing an outside basis greater than zero in a partnership that, for tax purposes, d[oes] not exist" (alterations in <u>Logan Tr.</u>) (quoting <u>United States v. Woods</u>, 517 U.S. __, __, 134 S. Ct. 557, 565 (2013))). We sustain respondent's partnership-item adjustments and partnership-level determinations.

IV.     <u>Consequences of Disregarding NMT</u>

The FPAA adjusted NMT's reported loss of $669,206, other deductions of $18,712, capital contributions of $2,242,417, and distributions of $1,124,620 all to zero. The loss, other deductions, capital contributions, and distributions are partnership items that are appropriately decided at the partnership level. Sec. 301.6231(a)(3)-1(a)(1)(i), (4), Proced. & Admin. Regs.; <u>see also</u> <u>Tigers Eye Trading v. Commissioner</u>, 138 T.C. at 103.

When a partnership is disregarded for tax purposes, the rules of subchapter K of chapter 1 of the Code no longer apply, and the partnership's activities will be deemed to have been engaged by one or more of its purported partners. <u>See, e.g.,</u>

[*35] 6611, Ltd. v. Commissioner, T.C. Memo. 2013-49. A disregarded partnership has no identity separate from its owners, and we treat is as an agent or nominee. See Tigers Eye Trading v. Commissioner, 138 T.C. at 94, 99. Pursuant to section 6233(a) and (b), TEFRA procedures still apply to the entity, its items, and persons holding an interest in the entity as long as the purported partnership filed a return, which NMT did for tax year 1999. See sec. 6233(b); sec. 301.6233-1T(a), (c)(1), Temporary Proced. & Admin. Regs., 52 Fed. Reg. 6795 (Mar. 5, 1987). Thus, we have jurisdiction to determine any items that would have been "partnership items", as defined in section 6231(a)(3), and section 301.6231(a)(3)-1, Proced. & Admin. Regs., had NMT been a valid partnership for tax purposes. See Tigers Eye Trading v. Commissioner, 138 T.C. at 97.

We have determined that NMT is not recognized as an entity for Federal tax purposes and, thus, cannot elect to be taxed as a partnership. As discussed supra, we still have jurisdiction to determine items that would have been partnership items if a tax-recognized entity had filed the return that NMT did file.

V.    Section 6662 Accuracy-Related Penalty

In the FPAA respondent determined that any underpayment of tax resulting from his adjustments of NMT's partnership items was attributable, in the alternative, to (1) gross (or if not gross, substantial) valuation misstatement(s),

**[\*36]** (2) a substantial understatement of income tax, or (3) negligence or disregard of rules or regulations. Hence, respondent determined that either a 40% penalty or a 20% penalty applies to any underpayment. See sec. 6662(a), (b)(1)-(3), (c)-(e), (h).

### A.    Jurisdiction Over Penalties

Section 6226(f) grants this Court jurisdiction to determine the applicability of any penalty that could result from an adjustment to a partnership item, "even if imposing the penalty would also require determining affected or non-partnership items". Woods, 571 U.S. at __, 134 S. Ct. at 564. That also includes determining the penalties that could be triggered by our determination that no entity exists for Federal tax purposes. See id. Our determination of accuracy-related penalties is provisional because further determinations may still have to be made at the putative partner level. See id.

### B.    Applicability of the Penalty

Section 6662(a) and (b)(1), (2), and (3) imposes an accuracy-related penalty if any part of an underpayment of tax required to be shown on a return is due to, among other things, negligence or disregard of rules or regulations, a substantial understatement of income tax, or a substantial valuation misstatement. The penalty is 20% of the portion of the underpayment of tax to which the section

**[*37]** applies. Sec. 6662(a). In the case of a gross valuation misstatement, 20% is increased to 40%. Sec. 6662(h)(1). The gross valuation misstatement penalty is a 40% penalty that applies to any portion of tax that a partner underpaid because he overstated the value of or his basis in property by 400% or more of its true value. Sec. 6662(e)(1), (h)(2). Only one accuracy-related penalty may be applied with respect to any given portion of an underpayment, even if that portion is subject to the penalty on more than one of the grounds set out in section 6662(b). Sec. 1.6662-2(c), Income Tax Regs.

The NMT spread transaction was used to generate tax losses by enabling petitioner to claim an artificially high outside basis in NMT. The FPAA deemed NMT to no longer exist, and accordingly, no partner could legitimately claim an outside basis greater than zero. See Logan Tr. v. Commissioner, 616 F. App'x at 429. If a partner used an outside basis figure greater than zero to claim losses on its respective tax returns, which petitioner did in this case, "then the resulting underpayment would be 'attributable to' the partner having claimed an 'adjusted basis' in the partnerships that exceeded 'the correct amount of such * * * adjusted basis'" within the meaning of section 6662(e)(1)(A). See Woods, 571 U.S. at __, 134 S. Ct. at 566. Regulations provide that when an asset's true value or adjusted basis is zero, then the value or adjusted basis claimed is considered to be 400% or

[*38] more of the correct amount, and the valuation misstatement is deemed gross and subject to the 40% penalty. See id. (citing sec. 1.6662-5(g), Income Tax Regs.).

We have determined that NMT was a sham partnership, and we have sustained respondent's adjustments to the return, triggering the gross valuation penalty. Because we find the 40% gross valuation misstatement penalty applicable to any underpayment resulting from respondent's adjustments, we need not address the substantial understatement and negligence penalties.

C.    Reasonable Cause

A section 6662 penalty will not apply to any portion of an underpayment resulting from positions taken on the taxpayer's return for which the taxpayer had reasonable cause and with respect to which the taxpayer acted in good faith. See sec. 6664(c). The taxpayer has the burden of proving reasonable cause and good faith. See Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001).

Partner-level defenses to any penalty, addition to tax, or additional amount that relates to an adjustment to a partnership item may not be asserted in the partnership-level proceeding. Sec. 301.6221-1T(c) and (d), Temporary Proced. & Admin. Regs., 64 Fed. Reg. 3838 (Jan. 26, 1999); see also New Millennium I. Individual partners may raise partner-level defenses through separate refund

[*39] actions following assessment and payment of the penalty. Sec. 301.6221-1T(c) and (d), Temporary Proced. & Admin. Regs., supra. Partner-level defenses are limited to those that are personal to the partner or depend on the partner's separate return and cannot be determined at the partnership level. Id. When the reasonable cause defense rests on the partnership's actions, we take into account the state of mind of the managing partner. Superior Trading, LLC v. Commissioner, 137 T.C. 70, 91 (2011) (citing New Millennium I), aff'd, 728 F.3d 676 (7th Cir. 2013). Defenses of Shakti as NMT's managing member and original TMP are partnership-level defenses. See, e.g., Santa Monica Pictures, LLC v. Commissioner, T.C. Memo. 2005-104.

Petitioner claims reasonable cause and good faith on the basis of its and NMT's reasonable reliance on Untracht's advice. Petitioner's argument that we should take into consideration AJF-1's reasonable cause and good faith defense is misplaced. In New Millennium I, 131 T.C. at 290, we determined that "AJF-1 * * * will not be able to raise partner-level defenses during this partnership proceeding" and that we will consider defenses of the managing partner, not a limited partner such as AJF-1. Mr. Bergmann, through Shakti, was the only individual with the authority to act on behalf of NMT, and it is his conduct that is relevant for determining whether we should sustain the accuracy-related penalty.

[*40] Whether a taxpayer acted with reasonable cause and in good faith is determined on a case-by-case basis, taking into account all of the pertinent facts and circumstances, including the taxpayer's experience, knowledge, and education. Sec. 1.6664-4(b)(1), Income Tax Regs. "Generally, the most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability." Id. Reliance on professional advice may constitute reasonable cause and good faith, but only if, considering all the circumstances, such reliance was reasonable. Freytag v. Commissioner, 89 T.C. 849, 888 (1987), aff'd, 904 F.2d 1011 (5th Cir.1990), aff'd, 501 U.S. 868 (1991); sec. 1.6664-4(b)(1), Income Tax Regs.

Reasonable cause exists where a taxpayer relies in good faith on the advice of a qualified tax adviser where the following three elements are present: "(1) [t]he adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment." Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002). Reliance may be unreasonable, however, if the adviser is a promoter of the transaction or suffers from "an inherent conflict of interest that the taxpayer knew or should have known about." Id. at 98.

[*41] Petitioner argues that Shakti reasonably relied on Untracht to prepare the NMT 1999 return. Petitioner, however, has not demonstrated that Shakti provided necessary and accurate information to Untracht or that Shakti relied in good faith on any advice Untracht provided. Accordingly, petitioner has not shown that Shakti reasonably relied on Untracht.

Additionally, petitioner argues that NMT had a reasonable basis for treating itself as a partnership. In assessing whether NMT had reasonable cause, we examine Shakti's role as NMT's managing partner and TMP. Specifically, we focus on Mr. Bergmann's conduct, as he controlled Shakti.

Mr. Bergmann is a highly sophisticated C.P.A. with significant tax experience. Mr. Bergmann, through Shakti, was involved in executing the NMT spread transaction and managing NMT. The option spread contributed to NMT was structured to yield and did yield tax benefits which Mr. Bergmann should have recognized as "too good to be true". Petitioner spent $1.2 million to purchase the option spread and reaped approximately $120 million in taxable losses. A reasonably prudent person, with Mr. Bergmann's C.P.A. background and tax experience, would not have conducted himself as Mr. Bergmann did in promoting and facilitating the tax losses arising out of the NMT spread transaction. Mr. Bergmann, through Shakti, did not act with reasonable cause and

**[\*42]** good faith in filing the NMT 1999 return, and therefore the gross valuation penalty applies.

VI.    Conclusion

We sustain respondent's adjustments to NMT's 1999 return. We find that NMT is a disregarded entity for Federal tax purposes. We further sustain respondent's determination as to the section 6662 accuracy-related penalty at the entity level to the extent determinable.

We have considered all other arguments, and to the extent not discussed above, we conclude those arguments are irrelevant, moot, or without merit.

To reflect the foregoing,

Decision will be entered under

Rule 155.