T.C. Memo. 2018-74

UNITED STATES TAX COURT

DAVID B. GREENBERG, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 1143-05, 1144-05,          Filed May 31, 2018.
            1145-05, 1334-06,
            1335-06, 1504-06,
            20673-09, 20674-09,
            20675-09, 20676-09,
            20677-09, 20678-09,
            20679-09, 20680-09,
            20681-09.

Bradley A. Patterson, for petitioners.

Paul Colleran and David A. Lee, for respondent.

---

[1] We consolidated the cases of David Greenberg, docket numbers 1143-05, 1335-06, 20676-09, 20677-09, 20678-09; Michelle E. Goddard, docket numbers 1144-05, 1334-06, 20679-09, 20680-09, 20681-09; and William A. Goddard, docket numbers 1145-05, 1504-06, 20673-09, 20674-09, 20675-09, for trial, briefing, and opinion.

[*2]        MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, <u>Judge</u>:  These cases are about a lawyer and a tax accountant who used a series of complex option spreads to generate millions in tax savings for themselves and their clients.  The Commissioner says these transactions look too much like Son-of-BOSS deals--a type of deal this Court has consistently said doesn't work.[2]  He argues that the taxpayers made a fortune selling tax shelters and tried to shelter their shelter income with the same kind of shelter.  He also takes issue with a large tax loss that the taxpayers say was generated when they abandoned their interest in a mysterious partnership--even though there is no paperwork to prove any such abandonment.

---

[2] Son-of-BOSS is a variation of a slightly older alleged tax shelter known as BOSS, an acronym for "bond and options sales strategy."  There are a number of different types of Son-of-BOSS transactions, but what they all have in common is the transfer of assets encumbered by significant liabilities to a partnership with the goal of increasing basis in that partnership or the assets themselves.  The liabilities are usually obligations to buy securities, and are typically not completely fixed at the time of transfer.  This may let the partnership treat the liabilities as uncertain, which may let the partnership ignore them in computing basis.  If so, the result is that the partners will have a basis in the partnership or the assets themselves so great as to provide for large--but not out-of-pocket--losses on their individual tax returns.  We have never found a Son-of-BOSS deal that works.  <u>See, e.g.</u>, <u>CNT Inv'rs, LLC v. Commissioner</u>, 144 T.C. 161, 169 n.7 (2015); <u>BCP Trading & Invs., LLC v. Commissioner</u>, T.C. Memo. 2017-151, at *2 n.2.

[*3]   The Commissioner issued two rounds of notices of deficiency.  The first disallowed losses from option spreads claimed through the taxpayers' partnership, GG Capital, as well as the abandonment loss.  The second disallowed losses the Commissioner says the taxpayers claimed from another partnership--AD Global-- through the same type of transaction.  The taxpayers say they never claimed these losses.  They also say the Commissioner got the procedure wrong--he should have issued notices of final partnership administrative adjustment (FPAAs), not notices of deficiency--and that he missed the statute of limitations.  If those arguments fail, they say these transactions were legitimate investments, not Son-of-BOSS deals.  The Commissioner thinks this sounds too good to be true.

FINDINGS OF FACT

I.    Greenberg and Goddard

Son-of-BOSS deals are usually complex, and often intentionally so.  This one was devised by two men who knew their way around the Code--David Greenberg and William Goddard.  Greenberg graduated from Boston University in 1981 with a degree in business and finance and earned a master's in accounting in 1984 from Bentley College.  He was a certified public accountant and worked at Arthur Andersen, KPMG, and Deloitte as a tax accountant.  Goddard graduated from UCLA in 1981 and from UC Hastings College of the Law three years later.

**[\*4]** After law school he went to work for Arthur Andersen doing tax analysis for corporate and international transactions. That's where he met Greenberg. Goddard worked for Arthur Andersen for two years before moving to a law firm. His firm merged into Baker McKenzie just a few months later, and he continued to practice tax law there. After Baker McKenzie, Goddard worked for another law firm before starting his own firm in 1998 called Lee Goddard and Duffy (LGD).

II.    GG Capital and Inflated Basis

In January 1997 Greenberg and Goddard formed a partnership called GG Capital. Goddard's law partner, Raymond Lee, became a GG Capital partner a short time later. A Panamanian investment company called Solatium was also briefly a partner, but it left the partnership by 1998.[3] Greenberg and Goddard claim GG Capital ran an active investment business in digital-option spreads for itself and its clients, completely unrelated to generating tax losses. There aren't many facts to support their claim.

---

[3] Solatium is a mystery. Greenberg admitted at trial that he didn't know the principals behind Solatium. Goddard testified that he didn't know Solatium's main business, when it was formed, or whether it filed a U.S. return. Solatium itself is an interesting word, and in Latin means roughly "solace". But in legal English, it is defined as "[c]ompensation; esp., damages allowed for hurt feelings or grief, as distinguished from damages for physical injury." Black's Law Dictionary 1607 (10th ed. 2014). There may well be some haunting or obscure relevance here, but nothing in the record.

[*5]   What's clear is that Greenberg and Goddard assigned large amounts of income from their day jobs to GG Capital.  Greenberg's income came from KPMG and Deloitte, and Goddard's from LGD.  Together they assigned millions to GG Capital.  GG Capital reported on its return ordinary income from each partner of:

| Partner | 1999 | 2000 | 2001 |
|---------|------|------|------|
| Greenberg | $617,000 | $898,000 | $851,000 |
| Goddard | 634,000[4] | 743,000 | 1,125,000 |

The Commissioner vigorously argues that this was merely a complicated attempt to offset ordinary income with the artificial losses GG Capital was about to generate.

Greenberg and Goddard also claim that GG Capital took part in a strange series of complex transactions that created an abandonment loss.  According to them, in October 1997 GG Capital acquired a 20% interest in a company called

---

[4] GG Capital's 1999 return reported a single assignment from LGD of $1.27 million.  Goddard's 1999 return showed $634,000 in income from LGD, suggesting that the remainder of the assignment was from Lee.  GG Capital's 2000 and 2001 returns each show two assignments from LGD, and on each of those returns one of the assignments matches the amount of LGD income on Goddard's return for the same year, meaning that in 2000 GG Capital started reporting Goddard's and Lee's assignments separately.

[*6] DBI Acquisitions II (DBI) and was credited with a $4 million capital account.[5] Milestone Acquisitions, which owned the other 80%, was an entity controlled by a client of Goddard's law firm. Next, Solatium borrowed 70 million Dutch guilders and GG Capital, Solatium, and an entity called Pacific Coin[6] formed a company called Connect Coin, LLC (Connect Coin). Goddard claimed that the three Connect Coin partners made the following capital contributions:

- Pacific Coin agreed to pay fees and costs for Connect Coin worth around $250,000;

- GG Capital agreed to have its partners provide legal and accounting services to Connect Coin; and

- Solatium contributed 9,225,000 guilders--which the partners agreed was the present value of 70 million guilders in 30 years--and Connect Coin assumed Solatium's obligation to make a balloon payment of 70 million guilders to Delta Lloyd Bank in 30 years.[7]

---

[5] The taxpayers don't claim GG Capital actually paid $4 million for its interest. They say this amount was the capital account of the previous DBI partner that GG Capital replaced.

[6] Pacific Coin was a partnership that operated pay phones. It was another one of Goddard's clients and was related to a company called Pacific Coin Management (PCM).

[7] Solatium had already borrowed 70 million guilders from Delta Lloyd Bank in exchange for a 30-year, interest-only note. Connect Coin apparently assumed only the obligation to repay the principal amount of 70 million guilders in 30 years, so Solatium made a capital contribution equal to what the partners agreed was the present value of 70 million guilders in 30 years--9,225,000 guilders.

**[\*7]**  Connect Coin then converted the guilders--worth around $4.5 million--into U.S. dollars and lent the $4.5 million to Pacific Coin.  As a result of Connect Coin's assumption of the guilder debt, Solatium recognized a gain and increased its basis in Connect Coin by about $35 million.  The parties then allegedly entered into an agency agreement under which Connect Coin agreed it would act as PCM and Pacific Coin's agent.  Solatium was treated as having made capital contributions to, and acquiring membership interests in, PCM and Pacific Coin.  Solatium claimed bases of $27 million in PCM and $8 million in Pacific Coin.

Solatium then contributed its 1% interest in Connect Coin to GG Capital, which increased GG Capital's interest in Connect Coin from 4% to 5%.  According to Goddard, this gave GG Capital Solatium's interests and carryover bases in PCM and Pacific Coin, so GG Capital's basis in PCM became $27 million and its basis in Pacific Coin became $8 million.  GG Capital then contributed its interest in Pacific Coin to PCM (Goddard claimed to simplify its ownership), which increased its purported basis in PCM to $35 million.  Its $35 million basis was reduced by a tax loss of $1 million on a Schedule K-1, Partner's Share of Income, Deductions, Credits, etc., that Pacific Coin issued GG Capital.

In December 1998 GG Capital contributed its interest in PCM to DBI.  After this flurry of shuffled paper, out came a $34 million basis in DBI just

[*8] waiting to be abandoned in exchange for a huge tax loss. Or so Goddard

claimed at trial. There are no documents in the record showing that any of this

actually happened.

III.    KPMG and the SOB Sales Machine

    A.    SOS Transaction

In 1999 Greenberg became a partner at KPMG and a member of Stratecon, a

KPMG group that designed and sold tax shelters to corporate clients. At the time,

KPMG was selling something called the Short Option Strategy (SOS)--a type of

Son-of-BOSS transaction--to its high-net-worth clients. The SOS transaction

required clients to (1) buy from a bank a foreign-currency option that involved

both a long and a short position;[8] (2) transfer the long position to a partnership,

which also assumed the client's obligation under the short position; and then (3)

withdraw from the partnership and receive a liquidating distribution of foreign

currency, which the client would sell at a loss. Greenberg helped promote the

SOS transaction to KPMG's clients. He also wrote multiple tax opinions blessing

---

[8] The long position required the bank to pay the client a certain amount if, on the expiration date, the exchange rate equaled or exceeded the rate specified in the contract. The short position required the client to pay the bank a certain amount if, on the determination date, the exchange rate equaled or exceeded the rate specified in the contract.

[*9] this kind of deal and arranged for several KPMG partners to participate in their own SOS transactions.

    B.    <u>JPF III</u>

    In 1998 Greenberg and Goddard formed a partnership called JPF III, which did SOS transactions for GG Capital. On November 17, 1999, JPF III entered into an option spread with Lehman Brothers. The option spread had two legs: one European digital call option sold by Lehman Brothers to JPF III (the long leg) and one European digital call option sold by JPF III to Lehman Brothers (the short leg).[9] The long leg cost $10 million and the short leg cost $9.8 million. But the

---

[9] There are two basic types of options--American and European. A European option can be exercised only at maturity. An American option can be exercised anytime during the life of the option. A digital option has only two possible outcomes at expiration: some fixed payoff amount or nothing. Digital options are typically also European-style options, which means that they can be exercised only on the option's expiration date. <u>Markell Co. v. Commissioner</u>, T.C. Memo. 2014-86, at *4 n.5; <u>6611, Ltd. v. Commissioner</u>, T.C. Memo. 2013-49, at *10 n.4.

    A call option gives the buyer the right to purchase an asset (e.g., stock or foreign currency) at a particular price at some point in the future. Option buyers pay a premium for that right. If the actual price turns out to be higher than the price where the option was struck (the "strike price") then the option buyer makes money. If the actual price is lower than the strike price, the call option expires worthless.

    A put option is the opposite. It gives the owner the right to *sell* at a particular strike price. A taxpayer would buy a put option if he thinks the price of a particular currency will go down. When buying a call option, it's common to say you are going long, and when buying a put option, it's common to say you are

(continued...)

[*10] only money that actually changed hands was the $200,000 net premium that JPF III paid Lehman Brothers. Lehman Brothers was the calculation agent for both legs of the option spread.

The long leg required Lehman Brothers to pay JPF III about $47 million if the spot rate on the yen/dollar exchange rate at 10 a.m. on November 16, 2000--as determined by the calculation agent, Lehman Brothers--was greater than or equal to 112.46 yen/dollar. The short leg required JPF III to pay Lehman Brothers about $46 million if the spot rate on the yen/dollar exchange rate at 10 a.m. on November 16, 2000, was greater than or equal to 112.47 yen/dollar. Again, the spot rate was determined by Lehman Brothers as the calculation agent. This created a one "pip" spread.[10] If both the long and short legs paid out, Lehman Brothers would owe JPF III a net payment of $627,000. The option spread would pay out ¥5.3 billion if the exchange rate hit the sweet spot, which means only the long leg ended up in the money. As it turned out, both the long and short legs

---

[9](...continued)
going short.

[10] "Pip" stands for "percentage in point" and is the smallest pricing increment used in foreign-exchange markets. For a yen/dollar trade, a pip is .01. The short leg's strike price was 112.47, while the long leg's strike price was 112.46. Comparing dollars to yen, a pip is .01 yen. On the basis of the strike prices for this option spread, 1 pip was worth approximately .009¢.

[*11] of JPF III's spread expired out of the money on November 16, 2000.  The

highest yen/dollar exchange rate on that day was 109.11.

C.      AD Global Fund

In October 1999 the Diversified Group, Inc. (Diversified), and Alpha

Consultants (Alpha) formed a partnership called AD Global Fund (AD Global).

Initially Diversified and Alpha were the only members--although others soon

joined--and both acted as managers.  Each contributed $50,000 in exchange for its

membership interest.

AD Global was designed to look like an investment company.  The

operating agreement said AD Global's purpose was to invest in foreign currencies,

futures contracts, and options.  Greenberg wrote an opinion letter that floated the

same idea.  In reality AD Global's members used it as a vehicle to conduct SOS

deals.

The general idea was for members to enter into foreign-currency option

spreads and contribute them to AD Global in exchange for membership interests.

Each member claimed its basis in AD Global equaled the premiums on its long

options but didn't reduce its basis by its obligations on the short options.[11]  The

---

[11] The Code says that a partner's basis in a partnership must equal the basis of the property the partner contributed to the partnership minus any liabilities the

(continued...)

[*12] option spreads either expired or were closed out early by Diversified. The members then terminated or sold their interests in AD Global--shortly after joining.

## IV. Creating Tax Losses

### A. 1999 Transaction

JPF III bought a membership interest in AD Global in November 1999, just after it was formed.[12] JPF III contributed its option spread with Lehman Brothers in exchange for a 33% membership interest. Although the net premium of the option spread was $200,000, the parties said it was worth only $100,000 at the time of transfer.[13]

---

[11](...continued)
partner contributed. Secs. 722, 752. (All section references are to the Internal Revenue Code for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.)

[12] By November when JPF III joined, AD Global had seven members including Diversified and Alpha. At that time Diversified and Alpha had only 7.2% interests.

[13] Greenberg and Goddard explained that JPF III entered into the 1999 transaction on behalf of GG Capital. The record on this issue--like many other issues in these cases--is a bit murky. There is an agency agreement, but the contribution agreement JPF III signed with AD Global says that JPF III was acting on its own and no agency relationship existed.

[*13] The last stage is where using a partnership and the tax rules for partnerships became critical to the scheme and how enormous tax losses magically appeared. JPF III and the other members claimed that their bases in AD Global equaled the values of long-option premiums they contributed but without any reduction for the value of the short-option liabilities AD Global assumed on their behalf. The members could liquidate their interests in AD Global in the year they wanted to recognize their tax losses. Just one month after JPF III became a member, it withdrew from AD Global and received CAN$82,800 in exchange for its interest. One considerable advantage of attaching the inflated basis to Canadian dollars was that JPF III could store it in an account to be drawn down as needed to shelter the ordinary income of the ultimate partners--Greenberg and Goddard. Greenberg apparently wanted a loss right away and--on behalf of JPF III--converted the Canadian dollars into US$57,000 within a week. Several other AD Global members did the same. This created an economic loss of $143,000 (the $200,000 net investment less the $57,000).

The only other thing AD Global did in 1999 besides receive the option spreads from its members was buy a $5 million long option on Canadian dollars and write a $4.9 million short option on Canadian dollars. The options expired

**[\*14]** and AD Global received CAN$147,680, which it used to buy back the interests of JPF III and the other members when they withdrew.  To summarize:



The taxpayers claimed at trial that JPF III bought the 1999 option spread (at least in part) on behalf of GG Capital.  They say that GG Capital then realized a

[*15] loss by the end of that year by selling 49% of the long leg to Greenberg and Goddard. The Commissioner, however, says the sale never happened.

Although we would expect to find a paper trail for this kind of thing, there's nothing other than the taxpayers' testimony to suggest the sale actually happened. In fact, we find the opposite. Under the option-spread agreement JPF III was not allowed to transfer "any interest or obligation in or under this Agreement * * * without the prior written consent of the other party." The taxpayers didn't produce any evidence that JPF III or GG Capital received prior written consent from Lehman Brothers to transfer the option spread. They did produce a purchase and sale agreement that says Greenberg and Goddard purchased all of GG Capital's "right, title and interest in and to [the long option leg] subject to all of [GG Capital's] duties, liabilities, and obligations." But they didn't produce any bank records or other evidence showing any payments that would let us find the sale actually took place.

Greenberg claimed that he and Goddard paid for this option spread by "a netting through the trust account mechanism." He claimed that LGD held a trust account on behalf of GG Capital. He seemed to suggest that he and Goddard just canceled out debts GG Capital owed them through this trust account. But again, there's no evidence that this trust account actually existed. We do not find the

[*16] taxpayers' testimony credible, and we find it more likely than not that the sale never took place.

B.    September 2000 Option Spread

On September 27, 2000, JPF III entered into another digital-option spread, this time with Deutsche Bank.  The terms of the option spread were very similar to those of the 1999 option spread.  There were two legs:  one European digital option that Deutsche Bank sold to JPF III (the long leg) and one European digital option that JPF III sold to Deutsche Bank (the short leg).  The long leg required JPF III to pay Deutsche Bank a premium of $50 million while the short leg required Deutsche Bank to pay JPF III a premium of $49.25 million.  Both payments were due on September 29, 2000.  But as with the 1999 option spread, these payments were subject to a netting provision, and so the only money that actually changed hands was the $750,000 net premium JPF III paid Deutsche Bank.  And as in the 1999 deal, the bank was the calculation agent.

The difference between the strike prices was again remarkably small.  The short leg's strike price was 119.73 while the long leg's strike price was only two pips lower at 119.71.  Based on the strike prices, one pip was worth only .008¢.[14]

_____

[14] For the ¥/$ comparison, one pip is .01¥.  The long leg's strike price was 119.71 ¥/$1.00, so .01¥/119.71 ¥ gives us one pip in dollars at that price:  .008¢.

[*17] And, on paper, the possible payoff looked huge:  Deutsche Bank promised to pay JPF III $100 million if the long leg ended up in-the-money (the sweet spot) and $4.5 million if both the long and the short legs ended up in-the-money.  But Deutsche Bank made sure it got to be the calculation agent that would determine the spot rate at 10 a.m. on January 18, 2001.

Greenberg and Goddard claim that JPF III bought the September 2000 option spread on behalf of GG Capital.  They also say GG Capital then sold 13% of the long leg to Greenberg and Goddard, generating part of GG Capital's loss for the 2000 tax year.  As with their similar claim about the 1999 option spread, there is no evidence in the record showing a sale actually happened.  Here again, we do not find the taxpayers' testimony credible and we find it more likely than not that the sale never took place.[15]

C.     November 2000 Option Spread

On November 27, 2000, JPF III entered into a third digital-option spread, again with Deutsche Bank.  Like the other two option spreads, it had a long and a

---

[15] Greenberg and Goddard argue that they never claimed losses from AD Global's transactions.  But with this sale, and the earlier one of part of the 1999 option spread we described supra pp. 15-16, they effectively transferred these losses to themselves.  We therefore disagree with their assertion that the converted-item notices of deficiency that the Commissioner sent to them were somehow ineffective as disallowing losses they never took.

[*18] short leg and Deutsche Bank was the designated calculation agent. The long leg required JPF III to pay Deutsche Bank a $3 million premium and the short leg required Deutsche Bank to pay JPF III a $2.97 million premium. There was a netting provision, though, so the only money that changed hands was the $30,000 net premium, which JPF III paid. Deutsche Bank had to pay JPF III $6 million (the sweet spot) if the spot rate on the yen/dollar exchange rate--as determined by Deutsche Bank--was greater than or equal to 114.9. But JPF III had to pay Deutsche Bank $5.91 million if the spot rate was greater than or equal to 114.92. If both the long and short legs were in-the-money, Deutsche Bank had to pay JPF III $90,000. This would all be determined by Deutsche Bank itself at 10 a.m. on January 28, 2001. The short and long legs' strike prices were again remarkably close--only two pips apart. One pip was worth about .009¢ for the November 2000 option spread.

The taxpayers repeat their argument that JPF III also bought this option spread for GG Capital and that GG Capital then sold the long leg to Greenberg and Goddard. They say this generated a portion of the section 988 loss GG Capital claimed in 2000. For the same reasons we stated above, we don't find the taxpayers' testimony credible, and we find it more likely than not that the sale never took place.

[*19] D.    November 2001 Option Spread

On November 30, 2001, an entity named PTC-A entered into a digital-option spread with Deutsche Bank.  This option spread was just like the first three:  There was a long leg and a short leg, Deutsche Bank was the calculation agent, and the option spread was subject to a netting provision.  The long leg required PTC-A to pay Deutsche Bank a $17 million premium on December 4, 2001, and the short leg required Deutsche Bank to pay PTC-A a $16.83 million premium the same day.  But because of the netting provision, PTC-A paid Deutsche Bank just the $170,000 net premium.  Deutsche Bank had to pay PTC-A $68 million if the spot rate on the yen/dollar exchange rate was greater than or equal to 132.60.  But PTC-A had to pay Deutsche Bank $67.32 million if the spot rate was greater than or equal to 132.62.  Everything was determined on March 4, 2000 at 10 a.m.  The short leg's strike price--132.62--was only two pips more than the long leg's strike price--132.60.  For the November 2001 option spread one pip was worth about .0075¢.

The taxpayers argue that this option spread too was bought on behalf of GG Capital, and that GG Capital sold the long leg to Greenberg and Goddard to realize a foreign-currency digital-option loss in 2001.  But this argument suffers from the same problem we've already analyzed--there is no paper trail.  We once again

**[*20]** don't find the taxpayers' testimony credible, and we find it more likely than not that the sale never took place.

V.      Criminal Investigation

This wasn't a good time to sell questionable tax strategies, and the U.S. government soon began investigating KPMG.  See, e.g., Memorandum and Order, United States v. Stein, No. 1:05-cr-00888-LAK, 2005 WL 3071272 (S.D.N.Y. Nov. 15, 2005).  The case expanded, and Greenberg was indicted for his role in the design and marketing of the SOS tax shelter at KPMG.  Superseding Indictment, United States v. Stein, No. 1:05-cr-00888-LAK (S.D.N.Y. Nov. 8, 2007), ECF No. 1286.  A superseding indictment said that Greenberg and KPMG marketed the SOS shelter as a means for wealthy individuals and corporations with significant taxable income to fraudulently reduce their taxes--resulting in about $400 million of phony tax losses.  Id. at 2. The Commissioner believes Goddard wasn't indicted because he fled to Portugal around the time Greenberg was indicted.  Greenberg's indictment refers to "the Orange County Attorney" who helped Greenberg implement the SOS shelter through GG Capital.  The indictment also says that Greenberg and "the Orange County Attorney" earned around $45 million from promoting the tax shelter, which they split 50/50.  Id. at 5.  Greenberg was eventually acquitted of criminal charges, and Goddard (if he

**[\*21]** was the "Orange County attorney") was never even indicted and returned home.

It was time for the civil-side lawyers at the IRS to resume their work.

VI.     What Was Reported

A.      1997 Return

Greenberg prepared GG Capital's 1997 partnership return and signed it on behalf of himself and the other partners--Goddard, Lee, and Solatium.  He attached a handwritten statement that said GG Capital was electing "to be subject to the provisions of 'Tefra' as defined in the IRC."[16]  The names of all four partners were on the purported TEFRA election, but Greenberg was the only partner who actually signed it.  He did, however, write the other partners' initials above their names.  At the bottom of the page a handwritten statement read:  "The GGC

---

[16] Before its repeal, see Bipartisan Budget Act of 2015, Pub. L. No. 114-74, sec. 1101(a), 129 Stat. at 625, part of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, secs. 401-406, 96 Stat. at 648-71, governed the tax treatment and audit procedures for many partnerships.  TEFRA partnerships are subject to special tax and audit rules.  See secs. 6221-6234.  TEFRA requires the uniform treatment of all "partnership item[s]"--a term defined by section 6231(a)(3)--and its general goal is to have a single point of adjustment for the IRS rather than having it make separate partnership-item adjustments on each partner's individual return.  See H.R. Conf. Rept. No. 97-760, at 599-601 (1982), 1982-2 C.B. 600, 662-63.  If the IRS decides to adjust any partnership items on a partnership return, it must notify the individual partners of the adjustment by issuing an FPAA.  Sec. 6223(a).

[*22] partners have authorized Greenberg to sign on their behalf." Greenberg did not, however, attach powers of attorney to the return to show that he was authorized to sign for Goddard, Lee, or Solatium. And at trial the taxpayers didn't call Lee or an officer from Solatium to testify about giving Greenberg authority to sign for them. Greenberg even admitted that he didn't know who Solatium's principals were. He claims he got authorization to sign the purported TEFRA election for Solatium from "a guy named Tommy Battilia," but admitted that he didn't know Battilia's position at Solatium.

Despite this handwritten statement that seemed to elect into TEFRA, Greenberg also checked the box on the same return that said GG Capital was not subject to TEFRA. On the 1997 partnership return there was a question that asked: "Is this partnership subject to the consolidated audit procedures of sections 6221 through 6233?" (i.e., TEFRA). Greenberg checked the "no" box. But in another confusing twist, Greenberg designated a tax matters partner (TMP) on the return, which is required under TEFRA but makes no sense for a non-TEFRA partnership.[17] The same thing happened on GG Capital's 1999 through 2001 returns: The "no" box was checked on each return in response to the question "Is

---

[17] Under TEFRA, a "partnership" designates one of its partners as the TMP to handle its administrative issues with the Commissioner and manage any resulting litigation. Sec. 6231(a)(7).

[*23] this partnership subject to the consolidated audit procedures of sections 6221 through 6233?" but each return also listed a TMP.

B.    1999 Return

AD Global reported on its 1999 return an ordinary loss of $1.14 million related to the option contracts.  The K-1 addressed to JPF III allocated it $334,000 of ordinary losses; $57,000 of distributions; and $97,000 of capital contributions. JPF III's 1999 return had no entries for income, expenses, assets, or liabilities. There were two K-1s attached to JPF III's return--one for Greenberg and one for Goddard.  The K-1s didn't list any distributive shares of income or loss.

GG Capital's return includes the ordinary income Greenberg, Goddard, and Lee assigned from their day jobs--$617,000 from Greenberg and $1.3 million from Goddard and Lee.  The return also reported $1.2 million in "consulting income," which the Commissioner says came from promoting Son-of-BOSS tax shelters. GG Capital claimed a $2.7 million section 988 loss[18] and an ordinary loss from AD Global of $334,000, which matched the ordinary loss reported on the K-1 that AD Global issued to JPF III.  The Commissioner thinks these are the ordinary

_____

[18] Son-of-BOSS transactions usually yield capital losses, but some attach the inflated basis to foreign currency in the hope that certain foreign-currency transactions may produce an ordinary loss.  See sec. 988; sec. 1.988-3(a), Income Tax Regs.

[*24] losses that Greenberg and Goddard used to shelter their personal income.[19] It also reported a $47,000 suspended loss from PCM.

On his 1999 return Greenberg reported $710,000 of income from Deloitte and $73,000 in income from GG Capital. The income from Deloitte was then "reversed" in two entries titled "Reverse Deloitte." Goddard's 1999 return was similar. Goddard reported $634,000 in income from LGD. He included a statement that said he transferred his economic interest in LGD to GG Capital, so he reported a $634,000 loss from LGD to "reverse" the income. Greenberg earned about $1.2 million in 1999, but after all this assignment of income and the GG Capital losses he reported only $108,000 in income on his return. Goddard did likewise. He brought in about $1.2 million in 1999 but ultimately reported only $272,000 thanks to this maneuvering.

C.     2000 Return

On its 2000 return GG Capital again included the ordinary income Greenberg and Goddard assigned to it from their day jobs--$898,000 from Greenberg and $743,000 from Goddard. It also reported the same type of losses as it had in 1999, except the losses were even larger. GG Capital reported a $15.85

---

[19] Greenberg and Goddard maintain that they claimed no losses from AD Global for any tax years.

[*25] million ordinary loss it again referred to as a section 988 loss and a suspended loss of $3.82 million. GG Capital reported ordinary income of $823,000, which included the amounts Greenberg and Goddard assigned from their day jobs during 2000. As they'd reported for 1999, Greenberg and Goddard "reversed" out the income they received in 2000 from Deloitte and LGD; Greenberg did the same for income from KPMG. Greenberg brought in about $6 million of income in 2000, but with the assignment of income and GG Capital's losses he said only $86,500 was taxable. Goddard similarly earned about $5.9 million in 2000 but said only $258,000 was taxable.

There was also the claimed DBI loss. On its 2000 California return GG Capital claimed a $3.2 million loss for "DBI Acquisitions Prior Suspended Losses Allowed," which the taxpayers say they are entitled to because GG Capital abandoned its interest in DBI--after its basis had been inflated through a series of convoluted maneuvers--in 2000.[20] The loss isn't separately stated on GG Capital's federal return.[21] Goddard testified that GG Capital claimed a $3.2 million

---

[20] During the examination of taxpayers' 2000 returns, the Commissioner couldn't find GG Capital's 2000 return, so he contacted the California tax authorities, who turned over GG Capital's 2000 California partnership return. The parties introduced the U.S. return at trial.

[21] On a sheet labeled "GGC Statement 1," there is something called "DBI
(continued...)

[*26] abandonment loss on its return, but it's not clear where. The Commissioner says the taxpayers camouflaged this loss by including it in the section 988 loss GG Capital reported.

### D. 2001 Return

On their 2001 returns taxpayers reported similar assignments of income and convoluted losses. On its return GG Capital once again claimed ordinary income that Greenberg and Goddard say they assigned from KPMG and LGD--$854,000 from Greenberg and over $1.1 million from Goddard. It reported $7.4 million of "royalties & other" income, which the Commissioner says came from promoting the Son-of-BOSS tax shelter. He says that Greenberg and Goddard offset this income with artificial losses just as they'd done in the previous years.

GG Capital reported an "FX digital loss" of over $38 million plus a "prior suspended loss" of $600,000, less a suspended loss of $29 million. This all netted out to about a $9 million loss. The Commissioner thinks this is just the 2001 version of the section 988 loss. GG Capital also reported a loss from JPF V, LLC (JPF V), of $95,000, but the taxpayers didn't introduce any evidence about JPF V at trial.

---

[21](...continued)
Acquisitins II, LLC" (spelling in original), but no amount is listed.

[*27] GG Capital sent a K-1 to Greenberg that reported $103,000 in ordinary income and a K-1 to Goddard that reported $296,000 in ordinary income. Greenberg and Goddard reported income from KPMG and LGD but reversed most of it out as they had done in previous years. Including his share of GG Capital's "royalties & other" income and KPMG income, Greenberg earned about $4.5 million in 2001, but with the losses sent up from GG Capital he reported only $61,000 in taxable income. Goddard earned about $4.8 million in 2001, but reported only $264,000 in taxable income.

## VII.   Audit and Notices of Deficiency

The Commissioner soon caught up. In 2003 he sent AD Global an FPAA for the 1999 tax year. He determined in the FPAA that AD Global was a sham, designed only to reduce its members' tax liabilities. The Commissioner disregarded the option spread JPF III contributed and said that JPF III (and AD Global's other members) should not be treated as partners for tax purposes. He also determined that JPF III should have taken the short leg of the option into account when it calculated its basis. The Commissioner disallowed $1.14 million of losses from the options and asserted penalties.

In 2004 the Commissioner sent Greenberg and Goddard notices of deficiency for the 2000 tax year. He asserted a $4.7 million deficiency against

[*28] Greenberg and a $4.5 million deficiency against Goddard--plus 40% accuracy-related penalties. The Commissioner increased each one's share of GG Capital's ordinary income (both by about $11 million) by disallowing the DBI loss and the section 988 loss. He also reallocated the income Greenberg and Goddard tried to assign GG Capital from their day jobs and allocated all of GG Capital's "royalties & other" income back to them.

In 2005 the Commissioner sent Greenberg and Goddard similar notices for the 2001 tax year. The 2001 notices increased Greenberg's and Goddard's income from GG Capital by about $8.1 million each. The Commissioner also disallowed the JPF V loss and the 2001 section 988 loss of $9.6 million. He reassigned the income Greenberg and Goddard tried to assign from KPMG and LGD, allocated to both Greenberg and Goddard all of GG Capital's "royalties & other" income for 2001, and asserted 20% accuracy-related penalties.[22]

In 2008 the Commissioner sent Greenberg and Goddard conversion letters saying that because they were under criminal investigation he would treat their AD Global partnership items as nonpartnership items under section 6231(c). The following year the Commissioner sent Greenberg and Goddard another burst of

---

[22] In his answers in the cases at the docket numbers that go with the 2001 notices, the Commissioner asserted an additional 40% accuracy-related penalty under section 6662(h).

[*29] notices, this time converted-item notices of deficiency. Greenberg and Goddard each got one for the 1999, 2000, and 2001 tax years. The Commissioner's reasoning was the same in each. He determined that AD Global was a sham, formed only to lower its members' tax liabilities. As a result the Commissioner treated the option spreads as never having been contributed and the losses purportedly realized by AD Global as realized directly by its members. He also determined that the AD Global members should not be treated as partners. The converted-item notices traced the effects up to Greenberg and Goddard--as partners in GG Capital and JPF III partners and purported indirect members of AD Global. The notices increased Greenberg's and Goddard's income by disallowing a total of $12.3 million in losses. The Commissioner also asserted 40% accuracy-related penalties.[23]

To summarize the notices and amounts for 1999:

| Type of notice | Petitioner | Tax year | Deficiency | Sec. 6662 Penalty |
| --- | --- | --- | --- | --- |
| Converted item | Goddard | 1999 | $1,284,000 | $514,000 |
| Converted item | Greenberg | 1999 | 1,256,000 | 502,000 |

---

[23] The Commissioner acknowledges that there is some duplication of disallowances in the notices of deficiency and converted-item notices. This will have to be sorted out in computations.

[*30] The 2000 tax year:

| Type of notice | Petitioner | Tax year | Deficiency | Sec. 6662 Penalty |
|---|---|---|---|---|
| Notice of deficiency | Goddard | 2000 | $4,556,000 | $1,822,000 |
| Converted item | Goddard | 2000 | 3,694,000 | 1,478,000 |
| Notice of deficiency | Greenberg | 2000 | 4,687,000 | 1,875,000 |
| Converted item | Greenberg | 2000 | 3,682,000 | 1,473,000 |

And the 2001 tax year:

| Type of notice | Petitioner | Tax year | Deficiency | Sec. 6662 Penalty |
|---|---|---|---|---|
| Notice of deficiency | Goddard | 2001 | $3,392,000 | $1,357,000 |
| Converted item | Goddard | 2001 | 250,000 | 100,000 |
| Notice of deficiency | Greenberg | 2001 | 3,336,000 | 1,334,000 |
| Converted item | Greenberg | 2001 | 242,000 | 97,000 |

## VIII. Petitions and Trial

Greenberg and Goddard disagreed with the Commissioner and filed petitions in Tax Court to dispute the notices. We consolidated all their cases. Things moved slowly as we waited for the criminal charges to be resolved.[24]

---

[24] The Commissioner sent Goddard's wife, Michelle, notices too. She will seek innocent-spouse relief after these cases are finished. Her attorney was not at trial other than to explain that Michelle was seeking innocent-spouse relief. Any final decisions in these cases will not be conclusive as to her relief under section 6015(g).

Greenberg lived in Florida when he filed his petitions, so venue on appeal
(continued...)

**[*31]** When we did finally try the cases, the Commissioner called two expert witnesses: Thomas Murphy and Hendrik Bessembinder. Murphy has testified in several similar cases for the Commissioner. See, e.g., Tucker v. Commissioner, T.C. Memo. 2017-183, at *33 n.7; AD Inv. 2000 Fund LLC v. Commissioner, T.C. Memo. 2016-226, at *4. In Tucker--which was tried after these cases--Murphy failed to list in his report all of the cases he had worked on in the last four years, a failure which violates Rule 143(g)(1)(E). As a result, we excluded his testimony. Tucker, at *33 n.7. Petitioners in these cases ask us to throw out Murphy's testimony and report here as well.

Rule 143(g) controls expert witness reports. It requires that an expert's report contain "the witness's qualifications, including a list of all publications authored in the previous 10 years" and "a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition."

---

[24](...continued)
for docket numbers 1143-05, 1335-06, 20676-09, 20677-09, and 20678-09 is in the Eleventh Circuit. See sec. 7482(b)(1). Goddard and his wife said on each of their petitions that their legal address was in California, which would make the Ninth Circuit the appellate venue for docket numbers 1144-05, 1145-05, 1334-06, 1504-06, 20673-09, 20674-09, 20675-09, 20679-09, 20680-09, and 20681-09. See id. But at trial Goddard testified that he was living in Portugal when he filed all but his first petition, which would make the D.C. Circuit the appellate venue for docket numbers 1504-06, 20673-09, 20674-09, and 20675-09. See id. (flush language). It's not clear from the record whether Mrs. Goddard ever lived there.

[*32] Rule 143(g)(1)(D) and (E). If the report doesn't, the expert's testimony will be excluded completely "unless the failure is shown to be due to good cause and unless the failure does not unduly prejudice the opposing party." Rule 143(g)(2). We cannot say Murphy's failure to properly list the cases where he served as an expert was due to good cause, so we must exclude his report and testimony as we have done in the other cases where he's testified. See Tucker, at *33 n.7; AD Inv. 2000 Fund LLC, at *2-*3.

Finally, although the Commissioner determined 40% accuracy-related penalties for each year and the taxpayers contested those penalties in their petitions, he introduced no evidence at trial that he had complied with section 6751(b). See Graev v. Commissioner (Graev III), 149 T.C. ___, ___ (slip op. at 13-15) (Dec. 20, 2017) (citing Chai v. Commissioner, 851 F.3d 190, 221 (2d Cir. 2017), aff'g in part, rev'g in part T.C. Memo. 2015-42), supplementing 147 T.C. 460 (2016).

OPINION

I.    Summary of Arguments

The parties make a number of arguments--and alternative arguments--but everything can be distilled to a few central issues. For Greenberg and Goddard:

[*33] • GG Capital made a valid TEFRA election for 1997, which means the Commissioner should have issued FPAAs to disallow the losses they claimed for 2000 and 2001;

• the Commissioner didn't send the 2000 notices on time, so those notices are invalid;

• GG Capital did abandon its interest in DBI and the loss it should have reported was over $30 million more than the $3.4 million loss that the Commissioner disallowed;

• the option spreads were legitimate investments and the AD Global transaction shouldn't be disregarded, and, regardless, the Commissioner can't argue economic substance because he didn't assert it in the notices; and

• GG Capital did in fact have losses from the sales of the long legs of three option spreads to Greenberg and Goddard between 2000 and 2001.

The Commissioner fires back that:

• GG Capital was not a TEFRA partnership because it failed to make a valid TEFRA election for 1997;

• he mailed the 2000 and 2001 notices on time;

• GG Capital's basis in DBI was artificially inflated through a series of supposed transactions that Greenberg and Goddard didn't prove happened, and Greenberg and Goddard didn't present any evidence that GG Capital owned an interest in DBI or that it ever abandoned that interest;

• the entire AD Global transaction was just another Son-of-BOSS deal--it was a sham that lacked economic substance; and

[*34] • GG Capital didn't sell the long legs of three option spreads to Greenberg and Goddard between 2000 and 2001.

## II. Jurisdiction and Procedure

### A. TEFRA Election

#### 1. 1997

We'll start with whether GG Capital made a valid TEFRA election for 1997. TEFRA procedures can be "distressingly complex and confusing." Tigers Eye Trading, LLC v. Commissioner, 138 T.C. 67, 92 (2012) (quoting Rhone-Poulenc Surfactants and Specialties, L.P. v. Commissioner, 114 T.C. 533, 540 (2000)), aff'd in part, rev'd in part sub nom. Logan Tr. v. Commissioner, 616 F. App'x 426 (D.C. Cir. 2015). And determining whether a partnership is even subject to TEFRA is no exception. Bedrosian v. Commissioner, 143 T.C. 83, 104 (2014). There's a presumption that TEFRA applies to entities that are required to file a partnership return. Sec. 6231(a)(1)(A). But TEFRA (and the presumption) doesn't apply to a small partnership, unless the small partnership specifically makes a TEFRA election.[25] Sec. 6231(a)(1)(B). A small partnership is a

_____

[25] TEFRA audits, with their sometimes arcane distinctions among "partnership", "affected", and "nonpartnership" items, can be burdensome, so Congress chose to keep the old audit rules under which each partner resolves his tax liability with the IRS separately for "small partnerships." Tax Compliance Act of 1982 and Related Legislation: Hearing on H.R. 6300 Before the H. Comm. on

(continued...)

[*35] partnership with ten or fewer partners, each of whom is an individual, a C

corporation, or the estate of a deceased partner. Sec. 6231(a)(1)(B)(i). To make

an election, a small partnership must attach a statement electing to be under

TEFRA to its tax return for the first year it wants the election to go into effect.

Sec. 6231(a)(1)(B)(ii); sec. 301.6231(a)(1)-1T(b)(2), Temporary Proced. &

Admin. Regs., 52 Fed. Reg. 6790 (Mar. 5, 1987). The statement must say it's an

election under section 6231(a)(1)(B)(ii), and it must be signed by everyone who

was a partner during that tax year. Sec. 301.6231(a)(1)-1T(b)(2), Temporary

Proced. & Admin. Regs., supra.

---

[25](...continued)
Ways & Means, 97th Cong. 259-61 (1982) (statement of John S. Nolan, Chairman, Section of Taxation, American Bar Association).

Until 1997 the consequences for the Commissioner of treating a TEFRA partnership as a small partnership and a small partnership as a TEFRA partnership could be severe: If the Commissioner incorrectly classified a partnership, this Court lacked jurisdiction and had to dismiss the case. See Frazell v. Commissioner, 88 T.C. 1405, 1411 (1987); Maxwell v. Commissioner, 87 T.C. 783, 788-89 (1986). "The Commissioner had the authority to correct his mistake and issue the proper type of notice, but the statute of limitations wasn't tolled by any procedural flubs and might expire." Nehrlich v. Commissioner, T.C. Memo. 2007-88, 2007 WL 1095675, at *2, aff'd, 327 F. App'x 712 (9th Cir. 2009); see sec. 6501(a). "This meant that a partner might go tax-free by defeating a notice of deficiency with the argument that the Commissioner should have sent him an FPAA, or defeating an FPAA with the argument that the Commissioner should have sent him a notice of deficiency." Nehrlich, 2007 WL 1095675, at *2.

**[*36]** A partnership is not a small partnership if any partner during the tax year is a pass-thru partner. Bedrosian, 143 T.C. at 104; see also sec. 6231(a)(1)(B)(i); Brennan v. Commissioner, T.C. Memo. 2012-187, 2012 WL 2740897, at *3, aff'd sub nom. Ashland v. Commissioner, 584 F. App'x 573 (9th Cir. 2014); sec. 301.6231(a)(1)-1(a)(2), Proced. & Admin. Regs. A pass-thru partner is "a partnership, estate, trust, S corporation, nominee, or other similar person through whom other persons hold an interest in the partnership." Sec. 6231(a)(9); Bedrosian, 143 T.C. at 104; 6611, Ltd. v. Commissioner, T.C. Memo. 2013-49, at *62 n.29; Rev. Rul. 2004-88, 2004-2 C.B. 166.

The purported TEFRA election here was a handwritten attachment to GG Capital's 1997 return. It said that the GG Capital partners were electing under section 6231(a)(1)(B)(ii) for GG Capital to be subject to TEFRA. GG Capital had four partners in 1997--Greenberg, Goddard, Lee, and Solatium. Greenberg was the only one who actually signed the statement; he just initialed the other partners' names. At the end of the page, the statement read: "The [GG Capital partners] have authorized Greenberg to sign on their behalf." Greenberg and Goddard say this election was effective for 1997 and was still in effect for 2000 and 2001, which would mean the Commissioner should have issued FPAAs for those years,

[*37] not notices of deficiency. But the Commissioner counters that GG Capital wasn't a small partnership in 1997 so it couldn't make an election.

It's true that GG Capital had fewer than ten partners in 1997, and that three of them were individuals. But the fourth partner--Solatium--causes problems for the taxpayers' argument. See sec. 6231(a)(1)(B)(i). GG Capital's 1997 tax return included three K-1s--one each for Greenberg, Goddard, and Lee. The K-1s don't specify the partners' interests in profits, losses, and capital; each just said "special" where the percentage interests should be. There was no K-1 for Solatium. But the purported election listed Solatium as a partner and described it as a "Foreign PTNR with Beneficial Interest by David Greenberg." That means Solatium held an indirect interest through Greenberg, which makes Greenberg a pass-thru partner. See sec. 6231(a)(9) and (10). Since Greenberg was a pass-thru partner, GG Capital didn't meet the requirements of a small partnership for 1997. See sec. 301.6231(a)(1)-1T(a)(2), Temporary Proced. & Admin. Regs., 52 Fed. Reg. 6789 (Mar. 5, 1987). That means GG Capital wasn't eligible to make a TEFRA election for 1997 and its attempted election was ineffective.

There's another reason the attempted election wasn't valid. A TEFRA election must be signed by each person who was a partner during the tax year for which the election was made. Sec. 301.6231(a)(1)-1T(b)(2), Temporary Proced. &

**[\*38]** Admin. Regs., <u>supra</u>. The attempted TEFRA election here wasn't signed by all of the partners--it was signed only by Greenberg. The statement itself said that Goddard, Lee, and Solatium's representative didn't sign the statement. It said that "[t]he GGC partners have authorized Greenberg to sign on their behalf." But Greenberg admitted during trial that he didn't even know who Solatium's principals were. He said he received permission to sign for Solatium from "a guy named Tommy Battilia" but didn't know his position at Solatium. Greenberg and Goddard didn't call Lee or an officer from Solatium to testify about giving Greenberg authority to sign. The purported signatures weren't actually signatures either--Greenberg just wrote the other partners' initials above their names. This failure alone would scuttle a TEFRA election, even if GG Capital could have otherwise made one. <u>See</u> <u>id.</u>[26]

---

[26] Section 6231(g) would usually make this discussion much shorter. It says that we should treat a TEFRA partnership as a non-TEFRA partnership if the Commissioner reasonably picked the wrong classification "on the basis of a partnership return for a taxable year." The peculiar record in these cases suggests that the taxpayers might have merit in their argument that the Commissioner--at the time his agents classified GG Capital--had in front of them only a *state* partnership return. That complicates the analysis, and we are not relying on section 6231(g) in support of our conclusion.

**[*39]**      2.      2000 and 2001

Next we turn to the taxpayers' argument that we should dismiss those cases arising from the 2000 and 2001 notices of deficiency because GG Capital was a TEFRA partnership for those years and the Commissioner should have issued FPAAs instead. The Commissioner points out that Greenberg checked the "no" box in response to the question "[i]s this partnership subject to the consolidated audit procedures of sections 6221 through 6223?" (i.e., TEFRA) on GG Capital's returns. The taxpayers claim Greenberg misread the instructions and thought the question was asking whether GG Capital was currently under audit. But based on what we observed at trial we do not find his testimony credible. Greenberg was a sophisticated tax accountant with a master's degree in accounting. He was also a CPA and worked for major accounting firms. He checked the same box each year. We don't believe he misunderstood what he was doing. And we won't allow the taxpayers to disavow after the fact clear statements they made on the returns. See Buchsbaum v. Commissioner, T.C. Memo. 2002-138, 2002 WL 1150779, at *4 ("statements in a tax return signed by the taxpayer are admissions unless overcome by cogent evidence that they are wrong").

GG Capital had only U.S. individual partners in 2000 and 2001--Greenberg, Goddard, and Lee--and its returns for those years didn't include any TEFRA

[*40] elections.  And we've already found that the taxpayers' argument that GG Capital made a valid TEFRA election in 1997 doesn't work.  GG Capital was therefore not a TEFRA partnership in 2000 or 2001, see sec. 6231(a)(1)(B), and the notices of deficiency are valid.

B.      Timely Mailing

We now turn to the timely mailing issue.  Greenberg and Goddard argue that the 2000 notices were mailed on October 16, 2004--one day after the statute of limitations ended for their 2000 tax year.  They hang their argument on the fact that the notices said the last day to file a petition in Tax Court was January 14, 2005.  That's 91 days after October 15, 2004--the date on the notices.  The taxpayers claim that since the notices say January 14 was the last day to file a petition, the Commissioner must have mailed the notices on October 16, 2004--a day late.  The Commissioner agrees that the notices should have said that January 13, 2005, was the last day to file a petition, but he doesn't think that means the notices were mailed on October 16, 2004; it just means someone at the IRS made a math error.

In deficiency cases we've said that the Commissioner has the initial burden of proving a notice of deficiency was properly mailed.  Clough v. Commissioner, 119 T.C. 183, 187 (2002); Cataldo v. Commissioner, 60 T.C. 522, 524 (1973),

**[*41]** aff'd per curiam, 499 F.2d 550 (2d Cir. 1974). We've also required the Commissioner to show that a notice of deficiency was properly delivered to the USPS for mailing. Clough, 119 T.C. at 187; Coleman v Commissioner, 94 T.C. 82, 90 (1990). In those cases we said that the Commissioner may prove proper mailing with evidence of his mailing process, corroboration by direct testimony, or documentary evidence. Clough, 119 T.C. at 187; Coleman, 94 T.C. at 90. When there is no dispute about the existence of a notice of deficiency, a properly completed Form 3877, USPS Firm Mailing Book For Accountable Mail, by itself is sufficient--absent evidence to the contrary--to show that the Commissioner properly mailed a notice of deficiency. Coleman, 94 T.C. at 91. "Exact compliance" with Form 3877 mailing procedures raises a presumption of official regularity in the Commissioner's favor. Clough, 119 T.C. at 188; Coleman, 94 T.C. at 90-91; see also United States v. Zolla, 724 F.2d 808, 810 (9th Cir. 1984); Meyer v. Commissioner, T.C. Memo. 2013-268, at *22.

The Commissioner introduced a Form 3877 showing he mailed the 2000 notices on October 15, 2004. The form was stamped "OCT 15 2004." It said that the IRS sent Greenberg and Goddard notices of deficiency from St. Louis, Missouri. The number "0012" was listed across from Greenberg and Goddard's names, which means the notices were for the 2000 tax year. The number "5" was

[*42] written in the box labeled "Total Number of Pieces Listed by Sender" and in the box labeled "Total Number of Pieces Received at Post Office." Someone from the USPS signed in the box labeled "Postmaster (Name of receiving employee)." The form was postmarked October 15, 2004 by a USPS stamp.

At trial the Commissioner called the group manager of the examination division in St. Louis during 2004--the group that prepared and issued notices of deficiency in 2004. She testified that when the statute of limitations was about to expire, as it was here, IRS employees would physically take a notice of deficiency to the post office to be mailed. She credibly testified that an IRS employee named Penny Schupmann was the one who prepared the 2000 notices for Goddard and his wife. Schupmann died before trial, but the IRS manager credibly testified that Schupmann was the "type of person that would do whatever needed to be done when it came to her work performance. If she had to personally take a notice to the post office, she would do that." This testimony and the postmarked Form 3877 compel us to specifically find it more likely than not that the 2000 notices were mailed on time. See Clough, 119 T.C. at 187; Coleman, 94 T.C. at 90-91.

III.   DBI Abandonment Loss

GG Capital claimed a $3.2 million loss on its 2000 California return for "DBI Acquisitions Prior Suspended Losses Allowed." This loss wasn't

**[*43]** specifically listed on GG Capital's 2000 federal return, but the Commissioner thinks that the taxpayers camouflaged it within the $15.85 million section 988 loss GG Capital did claim that year. The taxpayers say they were actually entitled to a $34 million loss--equal to GG Capital's basis in DBI-- because GG Capital abandoned its interest in DBI in 2000; but because they were being "conservative", they originally didn't claim the full loss. Goddard testified that GG Capital claimed a $3.2 million abandonment loss (although it's not clear where on the return). They now want to claim the entire $34 million.

The Commissioner thinks that Greenberg and Goddard artificially inflated GG Capital's basis in DBI through a series of convoluted transactions involving mysterious entities and individuals and observes that there aren't any documents showing anything actually happened. The taxpayers fire back at length by saying that there most certainly are documents--they just forgot to introduce them at trial.

This so-called abandonment loss looks a lot like the CARDS transactions we've dealt with on many occasions.[27] See generally Putanec v. Commissioner, T.C. Memo. 2016-221; Hunter v. Commissioner, T.C. Memo. 2014-132; Crispin v.

---

[27] Although the specific facts of each Custom Adjustable Rate Debt Structure (CARDS) deal invariably differ, many of the players and processes are the same. There are generally three stages: (1) loan origination; (2) loan assumption; and (3) loan "operation". See Kerman v. Commissioner, T.C. Memo. 2011-54, 2011 WL 839768, at *2, aff'd, 713 F.3d 849 (6th Cir. 2013).

[*44] Commissioner, T.C. Memo. 2012-70, aff'd, 708 F.3d 507 (3d Cir. 2013);

Kerman v. Commissioner, T.C. Memo. 2011-54, aff'd, 713 F.3d 849 (6th Cir.

2013); Country Pine Fin., LLC v. Commissioner, T.C. Memo. 2009-251.  But the

Commissioner doesn't attack the DBI loss on those grounds.  Instead, he focuses

on the absence of documents that show any of these disputed transactions even

occurred.

A taxpayer may deduct losses uncompensated during a tax year.[28]  Sec.

165(a).  But the burden is on the taxpayer to prove entitlement to any deduction he

claims.  Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).

This includes substantiating deductions.  Hradesky v. Commissioner, 65 T.C. 87,

89 (1975), aff'd per curiam, 540 F.2d 821 (5th Cir. 1976).

To claim an abandonment loss on an intangible asset--such as the

partnership interest the taxpayers say GG Capital abandoned--a taxpayer must

prove that it (1) owned the abandoned property; (2) intended to abandon the

property; and (3) took affirmative action to abandon the property.  See Citron v.

---

[28] Losses deductible under section 165(a) are called "abandonment losses to reflect that some act is required which evidences an intent to discard or discontinue use permanently."  Gulf Oil Corp. v. Commissioner, 914 F.2d 396, 402 (3d Cir. 1990), aff'g 86 T.C. 115 (1986), 87 T.C. 135 (1986), and 89 T.C. 1010 (1987), and aff'g in part, rev'g in part 86 T.C. 937 (1986); JHK Enters., Inc. v. Commissioner, T.C. Memo. 2003-79, 2003 WL 1233019, at *3.

[*45] <u>Commissioner</u>, 97 T.C. 200, 208-09 (1991); <u>CRST, Inc. v. Commissioner</u>, 92 T.C. 1249, 1257 (1989), <u>aff'd</u>, 909 F.2d 1146 (8th Cir. 1990); <u>Milton v. Commissioner</u>, T.C. Memo. 2009-246, 2009 WL 3460727, at *3; <u>JHK Enters., Inc. v. Commissioner</u>, T.C. Memo. 2003-79, 2003 WL 1233019, at *3.

The taxpayers failed to prove that GG Capital owned a partnership interest in DBI. Goddard did testify that GG Capital owned an interest in DBI and that it received at least one K-1, but there is nothing in evidence to support his claim. The taxpayers didn't substantiate their claim that GG Capital intended to abandon its interest in DBI and didn't show that they took any affirmative steps to do so. If GG Capital had truly abandoned an interest worth $34 million, we would expect to find a trail of documents--especially when the purported transactions were put together by a lawyer and an accountant. Instead we find nothing in evidence to support their testimony, and we do not find their testimony credible. Thus, the taxpayers are not entitled to deduct an abandonment loss.

IV.  <u>Son-of-BOSS Deal</u>

We now come to a familiar place: a Son-of-BOSS tax shelter. Greenberg and Goddard claim that there's nothing to see here. They say GG Capital conducted a real business and they simply used their expertise to take advantage of gaps in the digital-options market. Greenberg and Goddard justify the

**[*46]** option-spread transactions with a number of economic-substance arguments. They claim:

- economic substance isn't at issue because the option spreads made money and this wasn't a Son-of-BOSS deal;

- the Commissioner didn't properly plead economic substance; and

- even if he did, the option spreads had economic substance.

The Commissioner says he's heard all this before and that the taxpayers' convoluted arguments are designed just to distract us from what was really happening--a Son-of-BOSS deal. According to the Commissioner the taxpayers (1) entered into offsetting currency options; (2) contributed the option spreads to AD Global; (3) had AD Global do a few minor things to try to concoct a business purpose; (4) terminated the AD Global interest with a liquidating distribution of Canadian dollars; and (5) sold the Canadian dollars for an economic loss of $143,000 ($200,000 net investment in the November 1999 option spread minus the $57,000 received when converting Canadian dollars). This supposedly led to tax losses of $12.3 million between 1999 and 2001. He says these transactions swirling in and around AD Global and JPF III were all bred for a single purpose-- to create tax losses. And he says that we should disallow these losses because:

- the AD Global transaction was a sham, it lacked economic substance, and there wasn't a reasonable expectation of profit;

[*47] •   we should disregard AD Global as a partnership and JPF III as a partner;

•   the AD Global transaction lacked economic substance regardless of whether some spreads made money;

•   he properly raised economic substance in the converted-item notices issued in 2009; and

•   the taxpayers' experts used unreliable methods to evaluate the option spreads and we should listen to his expert instead.

While there are different varieties of Son-of-BOSS deals, what they have in common is the transfer of assets encumbered by significant liabilities to a partnership with the goal of inflating basis in that partnership or its assets.  See Kligfeld Holdings v. Commissioner, 128 T.C. 192, 194 (2007).  The liabilities are usually options of some sort, and always include at least one that seems contingent at the time of transfer.  Taxpayers who engage in these deals claim that this allows the partner to ignore those liabilities in computing his basis, which allows the partnership to ignore them in computing its basis.  The result is that the partners will have bases high enough to provide for large noneconomic losses on their individual tax returns.

A.   AD Global and JPF III as Partnerships

For this deal to work, it's essential that AD Global and JPF III be valid partnerships, because it is only the partnership-basis rules that seem to lend

[*48] themselves to this kind of chicanery. We begin our analysis as we usually do: Federal law controls the classification of an entity for federal tax purposes, Luna v. Commissioner, 42 T.C. 1067, 1077 (1964), so we must first determine whether AD Global and JPF III were in fact *bona fide* partnerships under the Code, see Markell Co. v. Commissioner, T.C. Memo. 2014-86, at *17.

The term "partnership" is defined as a syndicate, group, pool, joint venture, or other unincorporated organization, through or by means of which any business, financial operation, or venture is carried on. Secs. 761, 7701(a)(2). Mere co-ownership is not by itself enough. See sec. 301.7701-1(a)(2), Proced. & Admin. Regs. Instead, we look to several factors:

(1)     the contributions, if any, that each party has made to the venture;

(2)     the agreement of the parties and their conduct in executing its terms;

(3)     whether business was conducted in the joint names of the parties;

(4)     whether each party was a principal and coproprietor, sharing a mutual proprietary interest in the net profits and having an obligation to share losses, or whether one party was the agent or employee of the other, receiving for his services contingent compensation in the form of a percentage of income (not a relevant distinction in these cases);

(5)     whether the parties exercised mutual control over and assumed mutual responsibilities for the enterprise;

(6)     the parties' control over income and capital and the right of each to make withdrawals;

**[*49]** (7)  whether separate books of account were maintained for the venture; and

(8)  whether the parties filed Federal partnership returns or otherwise represented to the Commissioner or to persons with whom they dealt that they were joint venturers.

Luna, 42 T.C. at 1077-78; see TIFD III-E, Inc. v. United States, 459 F.3d 220, 231-32 (2d Cir. 2006).  As with any such prongified area of law, these factors make sense only if they help us answer a common underlying question.  That question here is whether the parties intended to, and did in fact, join together for the present conduct of an undertaking or enterprise.  Commissioner v. Culbertson, 337 U.S. 733, 742 (1949); Commissioner v. Tower, 327 U.S. 280, 286-87 (1946); Historic Boardwalk Hall, LLC v. Commissioner, 694 F.3d 425, 449 (3d Cir. 2012), rev'g and remanding 136 T.C. 1 (2011); Southgate Master Fund, L.L.C. v. United States, 659 F.3d 466, 488 (5th Cir. 2011).[29]  We will examine each of the applicable factors.

1.  AD Global

With regard to AD Global, most of the Luna factors require little discussion.

---

[29] As we noted in Markell, at *20 n.13, this type of entity-focused and intent-seeking approach to determining the existence of a partnership applies broadly--not just to partnerships engaged in dubious digital-option deals.

**[\*50]** *Parties' Contributions to the Venture.* AD Global was created in October 1999 and its managers, Diversified and Alpha, each contributed $50,000. JPF III, as well as its other members, entered into option spreads on foreign currencies and contributed them to AD Global in exchange for membership interests. This factor does weigh in favor of finding a partnership.

*Parties' Agreement and Whether Business Was Conducted in a Joint Name.* AD Global had a formal operating agreement, but the only "business" it conducted was the sale of the option pairs, which it quickly distributed to the members in liquidation of their partnership interests. JPF III withdrew from AD Global just one month after becoming a partner. The Canadian dollars JPF III received were converted into U.S. dollars within a week--generating enormous tax losses that were passed up to Greenberg and Goddard. Other AD Global members did the same.

Under any definition, "business" means a "course of activities engaged in for profit." Brook, Inc. v. Commissioner, 799 F.2d 833, 839 n.7 (2d Cir. 1986), aff'g T.C. Memo. 1985-462 and T.C. Memo. 1985-614; Lamont v. Commissioner, 339 F.2d 377, 380 (2d Cir. 1964) (quoting 4 Mertens, Law of Federal Income Taxation, sec. 25.08 (1960)). The phrase "course of activities" implies more than a single transaction; it implies routine, or a series of transactions. Here, there was

**[*51]** no "business" to conduct, just a single type of transaction, and even it wasn't in a joint name. These factors weigh very heavily against finding a partnership.

*Principal v. Employee and Lack of Mutual Control.* JPF III and the other members may have had interests in AD Global, but it was the managers--Diversified and Alpha--who held all the power under the operating agreement. Diversified and Alpha had "full and complete charge of all affairs" of AD Global. Members couldn't take "part whatsoever in the control, management, direction or operation" of AD Global, and they couldn't bind it in any way. The operating agreement limited the number of managers to two, and Diversified and Alpha had to consent to change that number. There was no mutual control--just control by Diversified and Alpha. This weighs against finding a partnership.

*Parties' Control Over Income and Capital and Right To Withdraw.* The operating agreement did provide that members would receive a pro rata share of items of income and loss based on their book capital accounts. But there's nothing to suggest there was any income to distribute--just losses. JPF III contributed the 1999 option spread to AD Global for its interest, but it sold the foreign currency that it received in redemption of its interest at a loss just a month after joining AD Global. These factors weigh against finding a partnership.

[*52] *Separate Books and Partnership Returns*. The operating agreement said AD Global would keep separate books and records. AD Global did file a Form 1065, U.S. Return of Partnership Income, for at least its 1999 tax year. It also issued K-1s to the members. The return shows that AD Global held itself out to the Commissioner as a partnership for federal tax purposes. These facts support finding a partnership.

But this entire multifactor test turns on the fair and objective characterization of all the circumstances. What we find is a scrupulous adherence to the formal requirements for making AD Global look like a partnership, but a complete absence in its operating agreement and actual operations of any objective indication of a mutual combination for the present conduct of an ongoing enterprise. We have to conclude that JPF III and the other members didn't intend to "join together" to undertake business under AD Global, and that JPF III and the other members were not partners in this purported partnership.

2.      JPF III

We also find based on the facts and circumstances that Greenberg and Goddard did not join together to form a partnership entity in JPF III. JPF III was created in 1998. Goddard testified that he *believed* the members were himself and Greenberg. But there's nothing showing Greenberg or Goddard contributed

[*53] anything to JPF III.  Greenberg and Goddard didn't produce a formal operating agreement or anything showing JPF III's "business" was conducted in a joint name.  Like AD Global, it served only as a conduit for option spreads and as a basis inflator.  Although there may have been mutual control between Greenberg and Goddard, nothing in the record shows that there was any real profit to control or that they had any formal right to withdraw.  There's no indication that JPF III kept books or records.  It did file partnership returns and issue K-1s to Greenberg and Goddard, but this is not enough, and we must conclude that Greenberg and Goddard didn't intend to "join together" to undertake business under JPF III.

## B.     The Business of Tax Savings

There is a second and separate hurdle to any finding that AD Global and JPF III were partnerships:  A partnership must conduct some kind of business activity.  See Culbertson, 337 U.S. at 742; Torres v. Commissioner, 88 T.C. 702, 737 (1987); Markell, at *22.  The caselaw clearly says that tax avoidance is "no more a business purpose than actually engaging in tax avoidance."  ASA Investerings P'ship v. Commissioner, 201 F.3d 505, 513 n.6 (D.C. Cir. 2000), aff'g T.C. Memo. 1998-305; see also Boca Investerings P'ship v. United States, 314 F.3d 625, 631 (D.C. Cir. 2003) ("The business purpose doctrine applied in ASA Investerings establishes that while taxpayers are allowed to structure their

[*54] business transactions in such a way as to minimize their tax, these transactions must have a legitimate non-tax avoidance business purpose to be recognized as legitimate for tax purposes.") We must decide whether the "parties intended to join together as partners to conduct business activity for a purpose other than tax avoidance." ASA Investerings P'ship, 201 F.3d at 513.

Greenberg and Goddard argue that all these transactions were entered into with the subjective intent to make a nontax profit through investment. At trial Goddard claimed that there was an opportunity to make money because these options seemed to be underpriced. The Commissioner thinks that this was merely pretext. A relatively minor business purpose will not validate a transaction if it's no more than a facade. Id. at 513-16. And AD Global and JPF III haven't demonstrated that "investment" was anything more than a facade to hide their true purpose--generating millions in noneconomic losses.

*Paired Options*. The paired options in these cases consisted of short and long European digital options that are almost identical to those we have seen in other iterations of the Son-of-BOSS deal. See, e.g., Markell, at *10. The terms of the option spread were also unusual. The strike prices were only one pip apart and very far out-of-the-money. The strike prices were so close together that, from a risk-management perspective, they were indistinguishable. The calculation agent

[*55] could choose any price that was printed at 10 a.m. on the date of expiration. The key fact is that the long option could not have been disposed of without the short option: We specifically find that Lehman Brothers would never have allowed JPF III to collect on the long leg or even dispose of it separately. Lehman Brothers, in its own economic self-interest, would also never have chosen a spot rate that fell in the "sweet spot."

*Profit Motive*. The record tells a story of why AD Global and JPF III were formed different from the one Greenberg and Goddard tell. JPF III's entrance into and exit from AD Global were necessary to generate GG Capital's enormous artificial losses. There was no real expectation of earning money. JPF III bought the 1999 option spread in November and contributed it to AD Global within a week. JPF III increased its basis in AD Global by the premium charged for the long leg of the option spread, but ignored the short leg. JPF III then left AD Global within a month. GG Capital's tax benefits were completely disproportionate to what the option spread was worth. JPF III paid only the net premium of $200,000, but the parties managed to create tax losses of around $12.3 million between 1999 and 2001. We find there wasn't a nontax need to form the partnerships to take advantage of any purported potential profits of investing in digital options. We therefore find that the only purpose for AD Global and JPF III

[*56] was to carry out a tax-avoidance scheme.  And we find Greenberg and Goddard never intended to run businesses under the umbrella of these entities, and we will disregard AD Global and JPF III for tax purposes for this reason too.

We also have to note that the facts here fall squarely within those of other cases disallowing deductions in Son-of-BOSS deals.

In 6611, Ltd., at *8-*9, the taxpayers scored gigantic paydays in contingency fees.  A promoter approached the taxpayers with an aggressive tax-planning strategy involving digital options and Canadian dollars.  Id. at *13-*16.  The scheme began with the purchase of foreign-currency short and long options as well as Canadian dollars through a single-member LLC, the formation of a partnership with a third party, and the contribution of the options and the Canadian dollars to that partnership.  Id. at *12.  The options then expired worthless, creating huge tax losses at the partnership level that could be unlocked when the single-member LLC sold the Canadian dollars it received when the partnership liquidated.  See id.  There, the Commissioner argued the LLCs were single-member LLCs and should be disregarded for tax purposes.  Id. at *47.  The taxpayers countered that because theirs was a community-property state, their wives were the second owners of the LLCs, making the LLCs partnerships by default under the regulations.  Id. at *49; see sec. 301.7701-3(a) and (b)(1)(i),

[*57] Proced. & Admin. Regs. We disagreed with the taxpayers, because not a single Luna factor weighed in favor of finding a partnership entity and several weighed heavily against it. 6611, Ltd., at *56-*58.

In Historic Boardwalk Hall, LLC, 694 F.3d at 455-60, the Third Circuit concluded that a partner who avoids any meaningful downside risk in the partnership, while enjoying no meaningful upside potential, is not a *bona fide* partner at all. Following the Second Circuit, the court held that to be a *bona fide* partner for tax purposes, a party must have a meaningful stake in the success or failure of the enterprise. Id. at 449 (citing TIFD III-E, Inc., 459 F.3d at 231). The Second Circuit itself had disregarded two foreign banks as possible partners because the prevailing character of their interests resembled debt rather than equity. TIFD III-E, Inc., 459 F.3d at 231 (finding the purported interests were "overwhelmingly in the nature of a secured lender's interest, which would neither be harmed by poor performance of the partnership nor significantly enhanced by extraordinary profits").

The Seventh Circuit in Superior Trading, LLC v. Commissioner, 728 F.3d 676, 680 (7th Cir. 2013), aff'g 137 T.C. 70 (2011) and T.C. Memo. 2012-110, disregarded a supposed partnership where it lacked any purpose other than tax avoidance. In that case the partners created an LLC and contributed to it

[*58] uncollectible accounts receivable from a defunct Brazilian company. Id. at 678. The partners then sold their interests to outsiders who could take advantage of the losses on the sales of the worthless receivables--all because of a since-closed loophole in the Code. Id.; see American Jobs Creation Act of 2004, Pub. L. No. 108-357, sec. 833, 118 Stat. at 1589 (amending sections 704(c) and 743). The court found that the sole purpose of creating the LLC was to transfer the losses of the bankrupt Brazilian retailer to U.S. taxpayers who could then deduct the losses from their taxable income. Superior Trading, LLC, 728 F.3d at 679. The court also found that a *bona fide* partnership requires a joint business goal by the partners. Id. at 680 (finding no joint business goal where one partner aimed to extract value from a worthless asset, and the other aimed to make the loss from that asset a "tax bonanza").

We will trudge this same path today. We find that AD Global and JPF III were created to carry out tax-avoidance schemes, and we find that the members never intended to run a business through AD Global or JPF III. We find that the members did not join AD Global or JPF III with the intent to share in profits and losses from business activities. We also find that option spreads were done through AD Global and JPF III only to further a tax-avoidance scheme. And we

**[\*59]** find that the character of the resulting tax loss, and not any potential for profit, was the primary consideration in buying and then distributing the option pairs.

We will therefore disregard AD Global and JPF III.

C.      Consequences of Disregarding AD Global and JPF III

When we disregard a partnership for tax purposes, we are holding that the rules of subchapter K of chapter 1 of the Code (the substantive law governing the income taxation of partners) no longer apply, and that we will treat the partnership's activities as engaged in directly by the purported partners. See 436, Ltd. v. Commissioner, T.C. Memo. 2015-28, at \*34. A disregarded partnership has no identity separate from its owners, and we treat it as just an agent or nominee. See, e.g., Tigers Eye Trading, LLC, 138 T.C. at 94, 96, 99. But disregarding the partnership doesn't necessarily mean that all the items reported by the disregarded partnership are reduced to zero. See, e.g., ACM P'ship v. Commissioner, 157 F.3d 231, 262-63 (3d Cir. 1998) (allowing deductions for securities that had "objective economic consequences apart from tax benefits \* \* \* even when incurred in the context of a broader transaction that constitute[d] an economic sham"), aff'g in part, rev'g in part T.C. Memo. 1997-115.

**[*60]** In these cases that means we treat everything as being owned directly by Greenberg and Goddard--and this includes the option pairs. We also treat the option pairs as never having been contributed to AD Global or purchased by JPF III, and any gain or loss supposedly realized by AD Global and JPF III as having been realized by Greenberg and Goddard. They are not treated as partners, since there are no partnerships. With regard to the option contracts specifically, we incorporate our analysis in Markell and adopt its holding again here. Markell, at *35-*36. Greenberg and Goddard should have treated the foreign-currency options as a single-option spread--meaning the long and short positions were part of one contract and couldn't have been separated as a matter of fact and law. See id.; cf. sec. 1092 ("straddle" rules). We sustain the Commissioner's disallowance of the losses Greenberg and Goddard claimed.

## V.     Sales of Long Options

The taxpayers' Son-of-BOSS deal with AD Global and JPF III didn't create massive tax losses because we've disregarded those partnerships for tax purposes. GG Capital's purported option sales in 2000 and 2001--the 13% sale of the long leg of the September 2000 option spread, the sale of the long leg of the November 2000 option spread, and the sale of the long leg of the November 2001 option

**[\*61]** spread--also didn't generate large tax losses. But there's a different reason for that: Those sales never took place.

The taxpayers argue that JPF III and PTC-A entered into the three digital-option spreads on GG Capital's behalf, and that GG Capital then sold some or all of the long legs of each spread to Greenberg and Goddard for a tax loss. But we found it more likely than not that those sales never happened: The taxpayers presented no documentary evidence that the sales actually occurred, and we found their testimony on the subject incredible. See supra pp. 16-20. As with the abandonment loss, the taxpayers are therefore not entitled to these losses because they failed to prove the realization events--here, sales--actually occurred. See Rule 142(a); INDOPCO, Inc., 503 U.S. at 84; see also sec. 1.165-1(b), Income Tax Regs. ("loss must be evidenced by closed and completed transactions, fixed by identifiable events, and \* \* \* actually sustained during the taxable year").

## VI. Penalties

All that is left are the penalties. The Commissioner has the initial burden of production against the taxpayers because they are individuals. Sec. 7491(c) (Commissioner has burden of production "with respect to the liability of any individual for any penalty"). He seeks 40% penalties here under section 6662(a)

**[\*62]** and (h), so he must first show gross-valuation misstatements for each year. A gross-valuation misstatement exists if the value or adjusted basis of any property claimed on the partnership return is 400% or more of the correct amount. Sec. 6662(a), (b)(3), (e)(1)(A), (h)(2)(A)(i). The Commissioner satisfied this part of his burden of production: The inflated GG Capital losses for each year don't happen without overstating adjusted bases by more than 400% of the correct amount.

But section 7491(c) also places on the Commissioner the burden to show that accuracy-related penalties were "personally approved (in writing) by the immediate supervisor" of the IRS employee who made the initial determination to assert them in the notice of deficiency. Sec. 6751(b); Graev III, 149 T.C. at ___ (slip op. at 14). The Commissioner failed to do that. So he did not meet his burden of production, and the taxpayers are not liable for the penalties the Commissioner determined against them.[30] See Ford v. Commissioner, T.C. Memo. 2018-8, at \*6.

---

[30] The Commissioner also determined, as alternatives, that the 20% accuracy-related penalties for negligence, substantial understatement, or substantial-valuation misstatement apply. See sec. 6662(b)(1), (2), and (3). He also failed, however, to show compliance with section 6751 for these penalties.

**[\*63]** Our opinion in <u>Graev III</u> has not yet been tested on appeal, so out of an abundance of caution we also consider one last issue--whether Greenberg and Goddard had section 6664 reasonable-cause-and-good-faith defenses for those gross-valuation misstatements. <u>See</u> sec. 6664(c). The only arguments that Goddard and Greenberg make are that there are no deficiencies, and that they relied on substantial authority for what they did.[31] We've already found that there are deficiencies, so that argument can't help them. Their substantial-authority argument is equally unpersuasive. They seem to suggest their "substantial authority" is the caselaw they cited in their briefs, but since we've already determined there is a deficiency we obviously don't believe the cases they cite say what they want us to think they say. Greenberg's and Goddard's cases are just like the other Son-of-BOSS cases we have consistently said don't work. The regulations tell us that this defense works only "if the weight of the authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary treatment." Sec. 1.6662-4(d)(3)(i), Income Tax Regs. Here we have a feather against a gymful of barbells--these deals never work and depend

---

[31] Substantial authority is not a defense to gross-valuation-misstatement penalties, but it is a defense to substantial-understatement penalties. <u>See</u> sec. 6662(d)(2)(B); sec. 1.6662-4(a), Income Tax Regs.; <u>see also</u> <u>Hughes v. Commissioner</u>, T.C. Memo. 2015-89, at \*33 n.11.

**[*64]** entirely on a misreading of old caselaw and a deliberate indifference to the meaning of partnership.[32]  Were it not for section 6751, we would find them liable for the 40% gross-valuation-misstatement penalty.

Decisions will be entered under

Rule 155.

---

[32] Greenberg also wrote several opinion letters blessing this deal, but we note that taxpayers can't use their own opinion letters as a reliance defense.  See Calloway v. Commissioner, 135 T.C. 26, 47 (2010) (reliance is only reasonable if adviser is independent--unburdened by a conflict of interest), aff'd, 691 F.3d 1315 (11th Cir. 2012).  Greenberg was a CPA and a partner at KPMG.  He worked in KPMG's Stratecon group, which focused on designing, marketing, and implementing shelters like this one.  Goddard was a practicing tax attorney and worked at Arthur Andersen and Baker McKenzie where he dealt with sophisticated corporate and international transactions.  Both knew what they were doing.